**TEXAS AND NEW ORLEANS RAILWAY COMPANY, Appellant,**

v.

**Melba HART et al., Appellees.**

No. 6395.

Court of Civil Appeals of Texas.

Beaumont.

Sept. 21, 1961.

Judgment Made Final and Rehearing Denied Oct. 11, 1961.

228

Keith, Mehaffy, McNicholas & Weber, Beaumont, for appellant.

Barber & Seale, Jasper, for appellees.

STEPHENSON, Justice.

This is a suit for personal injuries brought by appellees Mary Evelyn McCormick and Melba Joy Hart to recover damages from the Texas and New Orleans Railway Company, arising out of an automobile-train collision which occurred at a grade crossing on the Spencer Highway, near LaPorte, Harris County, Texas. Mary McCormick, the driver of the automobile, was nineteen and Melba Hart was seventeen years of age at the time of the collision.

The case was submitted to the jury upon special issues. The jury found: the failure of the railroad company to have a flagman was negligence and a proximate cause; there was not a blinker light operating, which was negligence and a proximate cause; the railroad failed to give adequate warning of the approaching train, which was negligence and a proximate cause; appellee Mary McCormick failed to keep a proper lookout and violated Art. 6701d, sec. 86, Vernon's Ann. Revised Civil Statutes, each of which act of negligence was a proximate cause; the fireman on the engine was negligent after discovering the perilous position of appellees, which was a proximate cause. The jury found that appellant railroad company did not fail to: ring the bell as they approached the crossing; to blow the whistle; keep proper control; and did not operate at an excessive rate of speed. Judgment was rendered by the trial court for Mary McCormick $5,000, and for Melba Hart $15,000.

Appellant first complains of the trial court's method of submitting discovered peril. It is contended "extrication" was not included in the submission. Special Issue No. 23 asked of the jury whether or not the fireman discovered the perilous position. The jury was instructed, in connection with this issue as follows:

"You are instructed that by the term 'discovered that they were in a perilous

position', as used herein, is meant that whenever it reasonably appears to a person in the fireman's position from the facts and circumstances within his knowledge that someone is pursuing a perilous course and probably will pursue it to the end, then in such an event, such a person is said to have knowledge of the peril of the other."

The question here is, does the phrase "that someone is pursuing a perilous course and probably will pursue it to the end" mean the fireman realized they could not and would not free themselves from the peril? Even though the wording used by the trial court is not as clear as it could have been, we hold this is a fair submission of "extrication" in connection with discovered peril. This is almost the identical wording used by the Commission of Appeals in Galveston, H. & S. A. Ry. Co. v. Wagner, 298 S.W. 552, 553, as follows:

"In order for a person to be in peril, it is not necessary that bodily injury will certainly be suffered by him. He is in peril whenever he is pursuing a course which probably will terminate in serious bodily injury to him. Whenever it reasonably appears to a second person, from facts and circumstances within his knowledge, that a person is pursuing such a course and probably will pursue it to the end, then, in such event, the second person is held to have knowledge of the peril of the other."

In addition, under the circumstances existing in this case, it was not necessary to include "extrication" in the submission to the jury. In his testimony the fireman admitted that he realized the car was in a position of peril and that they could not free or extricate themselves from their position of peril. In view of this admission, it was not necessary to submit Special Issue No. 23 asking whether the fireman discovered the perilous position. This became an undisputed fact, and the form of its submission became immaterial. It could not hurt the appellant. The Supreme Court has written clearly on this point in Texas & N. O. Ry. Co. v. Krasoff, 144 Tex. 436, 191 S.W.2d 1, 6, as follows:

"With defendant's engineer testifying that he recognized Krasoff was in a perilous position when the latter was 30 or 40 feet from the tracks and when the engine was three or four hundred feet from the point of collision, we do not believe the jury could have thought they were confined by the words 'at the railroad crossing in question immediately prior to the collision' to the very last instant before the collision. Moreover, in view of the engineer's testimony, we think the trial court could have assumed that Krasoff was in a perilous position not only at the point of collision but for at least 30 feet away from it, and that, therefore, it was unnecessary to submit the question of existence of peril in any form."

■ Appellant next contends that there was no evidence to sustain the jury finding that the fireman discovered the perilous position of appellees in time to have avoided the collision. The quantum of proof required of the appellees on the elements of discovered peril, in order to entitle them to have the issues submitted to the jury, was such facts and circumstances as taken together with all reasonable inferences therefrom constituted some evidence of probative force of their existence. In determining whether appellees discharged their burden we must view and interpret the evidence in the record in its most favorable light to the appellees, disregarding all evidence and inference therefrom favorable to the appellant. Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561, 563. We also know the rule to be, as followed in the Ford case:

"A jury will not be bound by the statement of defendant as to when he discovered the danger of plaintiff and as to the efforts made to avoid the injury."

It is impossible to know in a discovered peril case, the specific point a jury had in mind when it determined that a defendant could have avoided a collision by the use of all of the means at his command. This is one of the vices in the method of submitting discovered peril which has the approval of our courts. Even though the laws of this state require specific findings of primary negligence and contributory negligence, the same is not true of discovered peril. It is conceivable that in some instances, each of the twelve jurors may have had a different conception of the means at his command by which a defendant could have avoided a collision. The jury is not required to agree upon the specific means. This could be done readily by following the issue as to the discovery of the perilous condition, with various issues asking if the collision could have been avoided by doing a particular act according to the plaintiffs' theory of the case as it has been plead and proved. However, there is no such provision in the law of this state at this time, and the appellate court must follow the rules as outlined above in the Ford case, supra, in considering the record on appeal.

■ There were several estimates as to the speed of the train varying from 5 to 12 miles per hour. There were also several estimates as to the speed of the automobile varying from 35 to 45 miles per hour. The fireman testified he first discovered the automobile when he was 90 feet from the highway, placing the front of the engine 50 feet from the highway. An examination of Exhibit D-6 reveals that at a point 90 feet from the highway a person's vision is not obstructed in any way by the presence of the depot which was located 99.6 feet from the highway. The jury may have rejected the fireman's estimate of the distance of the car from the crossing and accepted his estimate of the speed of the automobile, and could have concluded the car was 200 feet or 300 feet from the crossing at the time of discovery. Using the estimate as to speed of the automobile given by the fireman of 35 miles per hour; if the car was 200 feet from the crossing at the time of discovery, the automobile and train would arrive at the crossing at the same time, if the train was traveling 12 miles per hour. Using the same speed of the automobile, 35 miles per hour, if the car was 300 feet from the crossing at the time of discovery, the automobile and the train would arrive at the crossing at the same time, if the train was traveling 8 miles per hour. In the first instance the time from discovery to impact would be 3.9 seconds and in the second instance 5.8 seconds. In much of their argument appellant assumes the only way the collision could be avoided would be for the train to stop. In the Ford case, supra, it is stated:

"The duty rested on the train operatives to slacken the speed of the train even if it could not be stopped before reaching the crossing."

We are dealing in split second timing in examining the evidence. At 35 miles per hour the appellees' automobile would travel about 12.7 feet in ¼th of a second. The evidence shows the automobile was struck broadside at about the front door. This means, in about ¼th of a second more the automobile would have cleared the track in safety. It is inconceivable to this court that neither the fireman nor the engineer knew whether there was an emergency brake valve on the fireman's side. The engineer testified: "I'm not sure, but I am positive there was one." The jury may have concluded there was an emergency brake valve on the side by the fireman, and that by the use of that means at his command he could have avoided the collision. Then again, the jury may have concluded the fireman by waiting 1 or 2 seconds, as he testified, or even longer, if he had 5.8 seconds traveling time between the time of discovery and the collision, even allowing for normal reaction time, delayed too long in warning the engineer, and that a prompt application of the emergency brakes might have allowed the appellees' automobile an additional ¼th to ½ of a second, to pass over the tracks in safety. There was evi-

dence of probative value and reasonable inferences to support the finding of the jury.

▮ Appellant contends next that there was a conflict in the answers of the jury to Special Issues Nos. 14 and 25. In answer to No. 14 the jury found the appellant was not guilty of negligence in failing to have its locomotive under proper control. In answer to No. 25 the jury found the fireman, after discovering the appellees' perilous position, failed to use all of the means at his command to avoid the collision. Appellant cites no authority as a basis for this contention. We hold that it is without merit. In any event, appellant, by not raising an objection to the alleged conflict at the time the jury returned its verdict, has waived the matter. Haddox v. Futrell, Tex.Civ.App., 321 S.W.2d 110.

This case being controlled by the issues on discovered peril, we find it unnecessary to discuss the points raised by appellant concerning the issues of primary negligence of the appellant and contributory negligence of the appellee, Melba Hart.

▮▮ After reading the entire record, we agree with appellant that the verdicts of $15,000 for Melba Hart and of $5,000 for Mary McCormick are both excessive. The evidence shows the accident happened around noon, August 18, 1958. The girls were taken by ambulance to a hospital in Baytown. While in the hospital Melba Hart had several stitches taken above her right eye, and Mary McCormick received no examination or treatment. They were picked up there by automobile by two boy friends and arrived in Kountze about 4:30 or 5:00 that afternoon. These two boys remained with them until 10:00 or 10:30 that night, and were not called as witnesses. The activities of the two girls on the afternoon of the collision demonstrates the lack of seriousness of their injuries. Mary McCormick was being cross-examined:

"Q. Mary, you said that it was 4:30 or 5:00 when you got back to Kountze on this Sunday afternoon? A. Yes.

"Q. And at this time you yourself had not been examined or treated by a doctor, is that correct? A. No.

"Q. That's right? A. That's right.

"Q. Now, when you got back to Kountze, what is the first thing that you did; did you say that you went to Melba's house and stayed about fifteen minutes? A. When we first got back in Kountze, we did.

"Q. And then from Melba's house, did you go to the Top Half? A. Yes.

"Q. All right. Now, you had not called your folks from Baytown, had you? A. No.

"Q. And so far as you knew, your folks knew nothing about the accident? A. No.

"Q. At the time either then you went to Melba's house or when you left there and got to the Top Half, your folks still knew nothing about it? A. No, not then.

"Q. They did know that you were going to Alvin? A. Yes.

"Q. But they didn't know anything about the accident? A. No.

"Q. All right. Now, how long did you stay at the Top Half the first time you went there? A. About fifteen or twenty minutes, something like that.

"Q. All right. Then where did you go from the Top Half? A. To my house.

"Q. Out to Honey Island? A. Uh-huh.

"Q. All right. And then is when, I guess, you told your folks about the accident? A. Yes, sir.

"Q. All right. Now, did you stay there the rest of the night at your

house and go to bed or anything? A. No, we stayed there about an hour or something like that.

"Q. All right. Then, was Melba still with you all this time? A. Yes.

"Q. So far as you know, her mother had not been contacted either? A. No.

"Q. Now, what time was it 5:30 or 6:00 o'clock when you got to your house? A. Yes.

"Q. And you stayed there about an hour, so you left your house about 7:00? A. Yes, sir.

"Q. Still with the two boys, Pennington and this other fellow and you and Melba? A. Yes.

"Q. Now, did you come back into town then, back into Kountze? A. Yes.

"Q. And I guess it was 6:30 or 7:00 when you got back into Kountze? Is that right? A. Somewhere along in there.

"Q. All right. Now, did you go back to the Top Half then? A. Yes.

"Q. You came back to town and talked to some friends out there? A. Yes.

"Q. All right. And then did you ride around Kountze for awhile? A. Yes.

"Q. All right. Still with Melba and still with the two boys? A. Yes.

"Q. This is a Sunday night; you didn't go to church or anything, you just rode around town? A. Yes.

"Q. And, I believe you testified on deposition that you rode around town until about 9:30 or 10:00 o'clock, is that right, visiting with friends and going to the Top Half and what not? A. Yes.

"Q. Now, what time was it that you went home; did you go home finally that night? A. Uh-huh. It was about 10:00 or 10:30, something like that when we got home.

"Q. All right. The accident had taken place right at noon, is that right? A. Yes.

"Q. And you still hadn't called Melba's folks? A. No."

Melba finished her senior year in high school and played basketball. She played two-thirds of the games and received a letter. Upon graduation in June, 1959, she worked at a cafe for about four months. In September, 1959, she made an application to enter military service. She passed the physical examination and entered the United States Air Force November 17, 1959. She marched only one day, and was discharged from the service 35 days before this case came to trial. Melba Hart visited Dr. Tate of Kountze September 3rd, 22nd, 26th and 27th. Her bill was $16 and he was not called as a witness. Melba was examined by Dr. Shorkey January 22, 1959 and January 11, 1960, which was two days before trial. Melba was also examined by Dr. Dickerson four days before the trial, and both of these doctors were called by her to testify. Melba testified she was suffering pain in her head, back and knee at the time of the trial. The x-rays were all negative as to the injury, or normal. Dr. Dickerson testified Melba's knee had recovered. He testified she had a severe strain or sprain in her lower back. He found signs of anxiety or instability which he said probably produced headaches. He concluded Melba would have 5 to 10 per cent permanent disability. Dr. Shorkey found Melba had a postural type of back strain, and that she did not appear to be in any particular distress or discomfort at the time he examined her. Dr. Shorkey further testified Melba was suffering from pain but upon direct examination by Melba's attorney, the following testimony was given:

"Q. And do you have an opinion based on reasonable probability as to

whether or not this pain will continue on in the future? A. My opinion as to that is this: I think it will depending, of course, a lot on the continuance of the posture defect itself.

"Q. Well, is it something then that you think there will be some degree of permanent—What is your opinion as to whether or not there will be come degree of permanence to this pain? A. Of course, one can't say whether or not it will be permanent or whether it won't be permanent because in the first place for the year now to my knowledge she hasn't been doing the exercises that would tend to correct it. Such cases are correctible by exercise, some aren't, and it's pretty difficult, I mean, in a given case to say whether it can be or whether it can't."

Mary McCormick testified the only physical injury she received was a cut on the lip which was healed at the time of trial. Her only complaints were nervousness, headaches and depression at times. She saw Dr. Tate at Kountze 2 or 3 days after the collision. He treated her for the lip and her nerves. He was the first doctor to examine or treat her. Dr. Joe Dickerson examined her one time during the week before the trial and was the only doctor who testified in reference to her condition. He testified Mary McCormick had probably lost 5 per cent of her earning capacity because of her anxiety reaction. The evidence reveals that Mary McCormick was employed by the Texas Highway Department at the time of the collision, and also at the time of trial. She testified she lost one full day from her work and several hours from time to time. The records of her employer showed she lost only three hours on September 9, 1958 because of her nerves due to the accident.

The excessiveness of the jury verdict in each instance shocks our sense of justice. Under the rule set forth in Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835, under the circumstances of this case, dam-

ages of $2,000 for Mary McCormick and $5,000 for Melba Hart would be reasonable compensation. Unless appellees, within two weeks after the filing of this judgment, file remittiturs to bring the amount of the judgment for each in conformity with the figures just stated, this case will be reversed and remanded for a new trial. If remittiturs are executed and filed with the clerk of this court within said time the judgment will be affirmed for the balance.

The judgment is affirmed conditionally.

Remittiturs having been filed this October 11, 1961, as suggested, our conditional affirmance is hereby adjudged to be final.