**Belmont S. BROCKETT, Appellant,**

v.

**Lester E. TICE, Appellee.**

**No. 15484.**

Court of Civil Appeals of Texas.

Houston (1st Dist.).

June 12, 1969.

Rehearing Denied Sept. 11, 1969.

Walter C. Clemons, Houston, for appellant.

Davis, Davis & Hornbuckle, Wm. E. Hornbuckle, III, Huntsville, for appellee.

BELL, Chief Justice.

Appellee recovered judgment against appellant in the amount of $44,273.04, for injuries received when he was injured while working for appellant. Appellant carried no workmen's compensation insurance. The jury found appellant had three or more employees, one of whom was appellee. The judgment was based on a finding of negligence on the part of appellant in failing to provide adequate lighting while appellee was moving furniture for appellant. While moving the furniture appellee received an injury to his right knee when some of the furniture he was moving fell on his knee. The jury found damages in the amount of $41,167.00 for lost earnings, reduced earning capacity, and for physical pain and mental anguish, including that suffered to the date of trial and that which would probably be suffered in the future. By separate issues the jury found medical expenses to the date of trial to be $781.04 and future medical expenses would be $2,325.00.

Appellant, for reversal, asserts appellee and his counsel repeatedly mentioned insurance to the jury when they both knew appellant had no insurance. He asserts the court erred in not sustaining his motions for mistrial because of this conduct. He further asserts this mention of insurance and the court's instructions to the jury in regard thereto caused the jury to return an unfair and unconscionable verdict against appellant. Though not briefed, there is a point of error asserting the trial court erred in not ordering a remittitur of $35,000.00.

There is a formal bill of exception reflecting two incidents that occurred. From it we learn that appellee's attorney in his voir dire examination of the jury panel "asked whether any juror had any connection with any insurance company." Appellant's counsel objected and excepted, but did not ask for a mistrial. The court sustained the objection and instructed the jury not to consider "same". He also instructed counsel to abandon such line of questioning and not to go into insurance any more. Shortly thereafter counsel for appellee asked the panel "whether any of them thought that a verdict in this case would affect their insurance rates." Appellant's counsel moved for a mistrial. This was denied. However, the court instructed counsel in the presence of the panel that insurance was not an issue in the case and not to refer to insurance.

By an informal bill of exception appearing in the statement of facts we learn the following occurred while appellant's counsel was cross-examining appellee:

"Q   In fact, up until this suit was filed you and Mr. Brockett were pretty good friends?

"A   We were good friends until I got hurt and got in the hospital, then he said he had insurance and not to worry about it. Everything would be taken care of, don't worry about things. And everything wasn't taken care of.

"Q   Why wasn't it?

"A   Because my wife and kids were going hungry, and he said, 'Don't worry, we would send the money.'"

At this point, in the absence of the jury, appellant's counsel objected and made a motion for mistrial, not only because of this mention of insurance but also this was the third time insurance had been mentioned. He also objected that the answer was not responsive to the question. It should be noted that there had been certain admissions made by appellant and read to

the court but not the jury. Appellant had admitted he carried no workmen's compensation insurance. He had admitted appellee had reported his injury the next day. He had admitted he had then told appellee the injury was covered by workmen's compensation insurance. He admitted he called Methodist Hospital and told someone in the office that appellee was covered by such insurance. He admitted he was not covered.

In the absence of the jury, after appellee had made the above statement, appellee, in explanation of why he made the statement, testified as follows:

"The only reason I said it, I didn't think like you said. When I went to work I figured automatically I was covered by insurance. He told me I was when I went into the hospital. He called the hospital and told them to admit me, and when I got out I went to see him and he told me not to worry. He called the insurance adjuster and everything would be taken care of. It took me about three or four months before I got hold of the insurance adjuster and he told me he didn't have any insurance."

The court overruled the motion for mistrial, but gave the following instruction:

"Ladies and gentlemen of the jury, in answer to a question the witness made a voluntary statement with reference to what Mr. Brockett said, I want to instruct you to bear in mind what I have already told you. There is no evidence in the case of any insurance, none has been admitted, and you will not consider, discuss, nor speculate whether or not any party is or is not protected in whole or in part by insurance of any kind in this case, unless evidence of insurance is admitted; and none has been admitted up to this time, therefore, you will please bear in mind not to consider this matter of insurance. It has nothing to do with the case under the instructions I have given you."

The court had previously given the instructions prescribed by Rule 226a, Texas Rules of Civil Procedure. One of those instructions is in substance that also given above by the court.

Appellee's basic position is that he had a right to ask the questions of the panel that are set out in the formal bill of exception, because he was entitled to obtain information from which it could be determined whether a juror was disqualified in the case on trial because of bias or prejudice. We might add that an attorney is entitled to obtain information to aid him in determining whether to exercise a peremptory challenge. Too, it is appellee's position that if the mentioning of insurance was error it was harmless error.

■ We are of the view that the effect of appellee's counsel asking the jury panel if any of them had any connection with any insurance company was to convey the impression that appellant had insurance. The question was knowingly and deliberately asked by counsel, as shown by his brief and in oral argument before this Court on the theory that he was entitled to get this information as a base for further questioning as to whether this would cause bias or prejudice on the part of the juror. This was error. There are other ways of questioning which can develop this fact without asking the question in that form before the whole panel.

■ After admonition by the court not to pursue that line of questioning, counsel then asked the whole panel "whether any of them thought that a verdict in the case would affect their insurance rates." The necessary effect of this was to infer that appellant had insurance because a verdict could not possibly affect their rates unless he had insurance. This was error.

■ Then following these two incidents was the unresponsive answer that appellee made that we have set out above, which showed that appellant told appellee he had insurance. This was error. M. J. Con-

struction Company, Inc. et al. v. Deatherage, 231 S.W.2d 501 (Tex.Civ.App.), n.w.h.; Alexander Schroeder Lumber Co. v. Merritt, 323 S.W.2d 163 (Tex.Civ.App.), n.w.h.

█ Having reached the conclusion that error was committed, we must determine whether it was such as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, T.R.C.P. We recognize that every casual or incidental and unintentional injection of insurance may not be reversible error. We so stated the rule in Atchison, T. & S. F. Ry. Co. v. Acosta, 435 S.W.2d 539 (Tex.Civ.App.), ref.,n.r.e. Whether the error is reversible depends on the facts of each case. Sometimes an instruction will cure the error. Sometimes the whole record in the case from a factual standpoint will reflect that harm probably did not result.

The only evidence in the case came from appellee and a witness offered by him.

Mr. Tice's principal occupation was that of a painter. His education consisted of school work through the eighth grade in Springfield, Massachusetts. Besides painting he did sand blasting, finished furniture, did common labor and was a machine operator. Mr. Tice received his injury December 5, 1965. He had been working for appellant about six months. Appellant was renovating a building which he intended to use as a place in which to operate Cafe Hannibal in Houston. For the six months preceding the injury, appellee had worked in and on the building doing various types of work. He painted, did carpentry work such as sheetrocking, built the bar and refinished furniture. There is no evidence that his work was not satisfactory. The only evidence is that there was no physical limitation on his ability to do the work. He had never suffered any pain in his knee nor limitation in its use. On the night of December 5, 1965, appellee and another employee were engaged in loading some furniture in a truck to be moved to the cafe. It was being loaded at a hangar at the John Mecom, Jr., property near Hitchcock. Appellee, Green Brown and Paul Bien were doing the loading. Appellant had gone ahead of the workmen. Mr. Mecom's secretary was there checking the furniture out as it was being loaded into the truck furnished by appellant. The work was being done at about 11 o'clock p.m. Appellee asked appellant if they could get some light and appellant said "no". Appellee told him they could not see to stack the furniture and appellant replied they would have to do the best they could. There were no lights at all on the truck. He started stacking the furniture in the truck as it was brought out. When the truck was about half loaded appellee placed a chair on a desk that had been loaded upside down. It evidently had not been loaded straight and the desk slipped. When it slipped he bent his arms and knees to catch "the load" and it hit his right knee. They couldn't see and the furniture was stacked all "kind of ways". He put himself against it to hold it and the desk came down and hit him on the knee. He yelled and appellant told him to take it easy. After the truck was loaded they brought the furniture to the cafe building and unloaded part of it. He was on the ground and Green Brown let a table slip as he handed it to appellee. It hit him on the same knee. Again there was no lighting to enable them to see while they were unloading. They didn't completely unload the furniture that night. There was a sharp pain coming and going. It hurt, depending on which way he turned. The next morning the knee was swollen. When he went to work he showed it to appellant and appellant sent him to see Drs. York and McReynolds.

The doctor told him he thought it was a pulled muscle and to go home and give it about two weeks' rest. At the end of two weeks it was swelling more and he went back to the doctor. The doctor drained fluid from the knee. He also took an x-ray. For about three weeks the fluid kept

building up. He was then taken to the hospital for an operation on the knee. He was in the hospital two or three weeks. He was then off work about three weeks. Then, while on crutches he did supervisory work. After the cast was taken off the knee kept hurting. He went back for treatment two or three times. The knee still swells. He wears a brace.

For the next seven months he couldn't work and the next three months he missed three or four days a week. Since then he has lost about two days a week. Considering his wage rate at $2.00 per hour, he stated his lost wages to the date of trial were $7,863.30. He is unable to do much work requiring stooping, bending or climbing without causing pain and swelling in the knee. Prior to the injury he had no trouble with his knee. Until the doctor discovered it, he did not know he had arthritis.

Appellee stated he didn't make enough money in 1965 to file an income tax return. He had been out of work until he went to work for appellant. At the time he and his wife had two children. In 1964 he worked most of the time. He generally, prior to the injury, worked most of the time.

Mrs. Tice said appellee told her on the night he had been moving the furniture about being hit twice on the knee. The next morning the knee was extremely swollen. Appellee still complains of pain and has swelling in the knee. Prior to the injury appellee never made complaints about the knee. She never had observed him favoring his knee. She and appellee married in 1960. When appellee had work he would often work 12 or 14 hours a day. This was because work wasn't always available. Appellee can no longer kneel for more than a few minutes without causing the knee to swell. She, at times, helps him put on and remove the brace he wears. Appellee wears the brace any time he is up and walking. He usually misses one' or two days a week because of swelling in the knee. After the injury when he could not work for some months, she got a job working.

Lynn Baird, a consulting actuary, testified in answer to a hypothetical question concerning the present value of earnings to be lost by appellee in the future. Appellee was 34 years old at the time of trial. The hypothetical question assumed the following facts: (1) that a person was capable of earning and was earning $2.00 an hour; (2) that he was 34 years of age; (3) that he had an estimated work life until age 65, or of 31 years; (4) that he was unable to work two days out of a six-day work week, the work week amounting to 48 hours; and (5) that the usual discount rate of 5% was used. The witness answered that based on the 1961 group table the present value of wages lost would be $25,512.00.

Dr. York, the physician who had attended appellee, testified appellee in giving the history stated he was moving some furniture and it somehow shifted and he twisted his right knee. When he saw appellee the knee was "markedly swollen and very painful." The witness withdrew 25 milligrams of yellow fluid and gave an injection of cortisone. Appellee was seen on three other occasions. In two weeks the swelling had recurred. On two other occasions fluid had to be removed. A gout test was made but the result was normal. On December 20, appellee was admitted to the hospital. On operating there was found to be a tear to the medial cartilage. The torn cartilage was removed. He also found some arthritis. The removal of the cartilage leaves the knee in an abnormal condition. It gives future disability in the form of knee bending, climbing ladders and squatting. It will give frequent pain and weakness in the knee. Appellee will have disability from this injury which will interfere with his work. The swelling and pain will return on his climbing, bending and squatting. When this occurs it is very probable he will have to lay off work a couple of days. There will probably be permanent disability. In the future he will

have to have treatment and the expense will be from $50.00 to $100.00 per year. He does not anticipate that the knee will get any better but will probably get worse.

On cross-examination the witness testified that a blow on the knee without falling or twisting would usually not produce a torn cartilage. One direct blow without falling would not cause a torn cartilage. (Appellee, who was 6 feet 7½ inches tall, had testified he had stooped to catch the furniture as it was falling and this was when the desk hit him on the knee.) The arthritis was not caused by the accident. He also testified if the falling object was heavy and a person's foot were twisted and his weight shifted to the leg, it could cause the injury. A blow doesn't have to be received to cause a torn cartilage. It can occur with a catching, a bending of the knee, and somehow the straightening of the knee will catch the cartilage and cause it to tear. A side blow will cause a more severe injury.

Appellee, in testifying as to lost wages to date of trial, stated in substance that he kept no records but was giving his estimates based on his recollection of losing from one to six days a week for a while and missing two days a week for the past two and one-half years.

The jury found that the first blow to the knee was due to the negligence of appellant in not furnishing adequate lighting and this was a proximate cause of appellee's injury. It found, however, that Green Brown was not negligent in letting the dropleaf table slip which caused the second blow to the knee. The jury had answered in response to Issue No. 1 that appellant had three or more employees, and in answer to Issue No. 2 had found appellee was working as an employee of appellant at the time of the injury. Because of the answers to Issues 1 and 2, the jury did not answer the defensive issues involving contributory negligence or assumption of risk.

It should also be noted appellee included in his pleading an assertion of aggravation of the arthritic condition. Also he pleaded the blow from the dropleaf table caused or contributed to his injury.

We are of the view in the light of the whole record here, that the injection of insurance, to the extent as above shown, was reasonably calculated to cause and probably did cause the rendition of an improper judgment. The court's instructions were ineffective to remove the harm.

Reversed and remanded.

## On Motion for Rehearing

On motion for rehearing we have been cited the case of South Austin Drive-In Theatre et al. v. Thomison et al., Tex.Civ. App., 421 S.W.2d 933, ref., n. r. e. It is contended that our decision is in conflict with that decision. We think not. We think the actual holding of the court was that the mere asking of the members of the panel whether they, any member of their family, or any of their friends were connected with the insurance industry would not of itself "constitute a showing of such prejudice as would be reasonably calculated to cause a miscarriage of justice." Too, the court noticed that there was no claim that the award of damages was excessive.

In the case before us there was not merely an inquiry of the panel as to whether any member had any connection with any insurance company, but there was also the unresponsive answer of appellee disclosing that appellant had told him he had insurance, and the further question by appellee's counsel as to whether any member of the panel thought a verdict in the case would affect their insurance rates. Appellant, on motion for new trial, and here, contended the damage award was excessive. We have, in our original opinion, reviewed the evidence. We remain of the view that the errors noticed, taken together, were so harmful as to require reversal.

Motion for rehearing overruled.