TEXAS & NEW ORLEANS RY. CO.,
Petitioner,

v.

Melba HART et al., Respondents.

No. A–8704.

Supreme Court of Texas.

April 11, 1962.

Rehearing Denied May 30, 1962.

Keith, Mehaffy, McNicholas & Weber, Beaumont, for petitioner.

Barber & Seale, Jasper, for respondents.

GREENHILL, Justice.

Melba Hart and Mary Evelyn McCormick were injured when their car was struck by one of the defendant railway company's engines near La Porte, Texas. Suit was brought on their behalf. The jury found the railway was negligent in failing to have in operation blinker-light warning devices and in failing to provide adequate warning at the crossing. It found the driver of the car, Mary McCormick, was also negligent in failing to keep a proper lookout and in other respects. The jury answered issues of discovered peril against the railroad: that its fireman discovered and realized the perilous position of the girls in time, and negligently failed to exercise the means at hand to avoid the collision. Judgment was entered against the railway: $15,000 for Melba Hart and $5,000 for Mary McCormick. That judgment was affirmed by the Beaumont Court of Civil Appeals solely on the basis of the discovered peril issues. 350 S.W.2d 227. It required a remittitur which reduced the amount of the recovery to $5,000 for Melba Hart and $2,000 for Mary McCormick.

Because the question is whether there is "some evidence" or "no evidence" to support the jury's answers to the discovered peril issues, the facts must be set out.

The driver of the car, Mary McCormick, age 19, decided to drive to Alvin to see a boy friend. She invited Melba Hart, age 17, who lived at Kountze, Texas, to ride with her. Melba did not share the expense and had no control of the car. The girls left Kountze around 9:15 a. m. on Sunday of the Labor Day weekend, 1958. They drove to Baytown, through the tunnel under the Houston Ship Channel, and stopped at a stop sign before entering Spencer Highway which runs east and west from La Porte, Texas, to the vicinity of Houston. They turned right onto Spencer Highway, in a westerly direction, heading toward Houston and Alvin and away from La Porte. The railroad crossing was about a half mile toward Houston from the stop sign. The car was driven at approximately 35 to 40 miles per hour when it got to the tracks and was struck. The time of the accident was around noon on a clear August day.

The terrain at and all around the crossing is flat. The railway track crosses the highway at right angles, in a north-south direction. There is a depot on the northeast side of the highway-railway intersection. At some time before the collision, it formed an obstruction to the vision of the driver of the car and the fireman of the train. It was located 99.6 feet north of the highway (from which direction the train came) and 21 feet east of the main railroad track. There was a spur or house track on the east side of the depot. The main track was on the west side of the depot.

The train in question consisted of a diesel engine and about 40 freight cars, 36 loaded with gravel and 4 empties. There is a dispute as to how many freight cars were on the spur track (which would also obstruct the vision of the driver of the car from the train, and the vision of the fireman of the car). The engineer testified

that he had spotted one car of automobiles on the spur track just opposite the platform of the depot. Having spotted the car, he backed to a switch, and was just getting underway again shortly before the collision.

An agent of the railway testified that at this intersection, there were on both sides of the track large railroad warning standards. At the top of the standard was a crossbuck; below the crossbuck were automatic flashing lights which were activated by a train on the track in the vicinity of the crossing. The standard on the east side of the track (the side from which the girls approached) was also equipped with an automatic bell. The standard on the other (western) side, he testified, had the flashing lights but no bell. The County had railway crossing signs on both sides of the crossing.

Melba Hart said that as she and Mary McCormick approached the crossing they were talking; that she first saw the train when it came out from behind the depot [which is 99.6 feet from the highway]. On cross examination, she testified that she didn't see the train until the automobile was crossing the track. She said she was looking straight ahead "and then I just happened to glance over my right shoulder and I saw the train just before it hit us." The engine struck the car on the car's right side, the side on which Melba was sitting.

She said there were no blinking lights, no bells ringing, no whistle blowing. She did not see any railroad crossing sign. On cross examination she admitted that "when the train hit me, I forgot everything I did know." As to the warning signs, she said, "I don't remember none of this stuff." She could not remember how fast the train was moving; she had no earthly idea.

Mary McCormick, the driver, also testified that there were no blinking lights at the crossing. She heard no bells or whistle. She was "normally looking down the highway," but she did not see the train until about a second before her car was hit.

She remembered the county railroad warning sign. She did not remember whether there were any railroad standards equipped with warning lights. She did not know whether the sign and the device were there or not. She did not see any blinking lights; there were none working to her knowledge.

She did remember the depot, and she did remember some box cars which were not moving [apparently on the spur track]. She had no idea as to the speed of the train. She had no idea how far her car was from the tracks when she first saw the depot. She just saw the train when the front of her car was on the track.

Mrs. Earlene Hart, Melba's mother, happened also to have driven across this highway and crossing that weekend. She testified that when she crossed there on Friday, there were no signal lights at the crossing. When she drove back across it on Monday, there was some sort of bell-like structure hanging over the highway. She could not remember whether it was anchored by a post on the left or right of the highway, or how it got put up over the Labor Day weekend. There was no evidence that there was a train in the vicinity to have activated the warning signals, assuming they were there. When she drove back on Monday, she had not been informed, and did not know, that her daughter had been involved in an accident at the crossing.

Roland Lee Gadman was driving on the Spencer Highway on the day of the collision. He was headed in the opposite direction from the girls. He was an eye witness. As he approached the crossing from the west, headed toward La Porte, he stopped because he saw the flashing warning lights on the railroad sign. The lights were in operation below the usual crossbuck sign. He was positive that there were similar devices on the opposite side of the track, which were still there; and he would say that they, too, were in operation. But he did not know, positively, that they were in operation since they were on the opposite side of the crossing. The traffic was heavy this weekend.

He first noticed the train when it was 75 to 100 feet from the highway—when it was just about even with the depot. The depot would be an obstruction to drivers approaching from the east, as plaintiffs were. He also observed one or two box cars on the spur track. He said the train was just starting, and estimated its speed at from 5 to 8 miles per hour. The engineer was blowing his whistle continuously, for a long time. Gadman heard it above his car radio. Bells were ringing.

He observed the plaintiffs' car when it was some 20 to 25 feet from the tracks. At this point the engine was entering the left hand side of the highway. The girls' car did not swerve: "she continued just like she didn't see it" [the engine]. After the collision, he got out of his car and walked down to the girls' car, some 50 feet down the track.

G. H. Montemat, the fireman, testified that he sat on the left side of the engine, the side toward the approach of the girls' car. He and the engineer had spotted a car on the spur track and backed to a switch to continue their journey from Houston to Texas City. He saw the plaintiffs' car "just as we came out from behind the depot"; "just as we passed the depot." On cross examination he testified that he first saw the plaintiffs' car when it was first within his sight range, when the automobile was approximately 100 feet from the crossing. We think, taken in context, he meant that he first saw the automobile when it was within his sight range after he passed the depot.

When the engine backed to the switch to the north of the depot, it came to a complete stop. His estimate of the distance from the switch to the highway was from 300 to 1000 feet. With its 40 loaded and empty cars, it had attained a speed, he estimated, of from 10 to 12 miles per hour. On cross examination, he admitted that the train could have been going as slowly as 5 to 8 m. p. h. He was just estimating. The engine itself is about 45 feet long, and his position was about 40 feet back from the front of the engine. He estimated that *he* was approximately 90 to 100 feet from the crossing when he first saw the approaching car which would place the front of the train some 50 to 60 feet from the highway. He was examined at length on what he did upon seeing the car then some 100 feet from the crossing. He said "for a second or so, I looked; and then I holloed to the engineer to shoot it" [apply the emergency brake]. On direct and cross examination, this "second or so" was also expressed as "a second or an instant," "immediately," "right away," "a second or two." He hollered "loud," and the engineer applied the emergency without delay, "real quick." The fireman realized the danger of the collision at the same time; he realized that the automobile was in peril, and he shouted to the engineer to "shoot it." After he had shouted to the engineer to "shoot it," he waived his arms out the window trying to attract the attention of the plaintiffs.

It was his duty to ring the bell. The bell is operated by a valve, like turning on a water faucet. He turned on the bell when the train started from its standing position at the switch. It rang continuously across the intersection. The engineer was blowing the whistle continuously from the switch through the crossing. The warning signal lights were working on his side [the plaintiffs' side]. After the collision, the engine stopped about 80 feet past the highway, "about two car lengths."

Montemat had been a fireman for the T. & N. O. about 18 years. He had made this particular run occasionally. He had been with Frank Rogers, the engineer, two or three times before. The fireman had not been on this particular engine in a good while, and he had not been on it since the accident. There was an emergency brake valve on the engineer's side, but he could not remember whether there was one on his side or not. He would not say there was not one. The emergency on the fireman's side was "some new equipment"; "they're coming out with them." If there was a

brake valve on his side, he didn't use it. He yelled to the engineer who put on the emergency without delay.

Frank Rogers, the engineer, testified that he had spotted a car of automobiles on the spur track and then backed to the switch for the main track. The switch was 1,000 to 1,100 feet from the highway. The train with its 40 cars, mostly loaded, weighed 2,650 tons. From its stopped position at the switch, the train was accelerating. It had 8 notches of speed on the throttle, and he had advanced the throttle to the 2nd position as it approached the highway. He had not planned to accelerate further because he had other work to do across the highway.

He put on the emergency immediately when the fireman shouted to him. That was when the *cab* of the engine was just past the depot, about 90 feet from the crossing. The cab is 41 feet back from the front of the train. The brakes, therefore, were applied when the front of the train was some 50 feet from the highway. He traveled some 50, 60, or 70 feet before he felt the impact of the car. The engine was not equipped with a speedometer. He estimated his speed at 10 m. p. h. when the fireman shouted to him, and that the engine's speed had been reduced by "at least a third" at the time of the impact. On cross examination, he conceded that he could have been going as slow as 5 and not faster than 10 m. p. h. before applying his brakes.

He further testified that the train has air brakes. For them to work, the air runs throughout the [40-car] train, and the brakes on each car set at one time. The train was 1,600 feet long. When the emergency is applied, the power is automatically killed; it is unnecessary to touch the throttle; and sand is dropped under the engine's wheels. There is no evidence as to how long this operation takes. Nor is there evidence as to how long it takes to stop a train of this size and weight at the speed at which it was going. The engineer testified that the train traveled 175 feet from the time the fireman hollered "shoot it" until it came to a stop; that he stopped it within 200 feet; that the automobile came to rest on his side of the engine, about 85 feet from the highway. He climbed down from the cab immediately and went to the driver. He asked, "Child, didn't you see the train?" She answered, "Not till we were practically on it. * * * We were talking about an accident we nearly had down the highway."

He did not know whether there were two emergency brake valves or one on the engine. He knew that there was one on his side. On cross examination he conceded that he had said on deposition, "I'm not sure, but I am positive there must be one." He concluded on the stand by saying, "I'm not positive."

The engineer was responsible for the whistle. He blew two long blasts as he left the switch, approximately 1,000 feet from the crossing. Then he blew a series of two long, a short and long blasts. Approaching the crossing, he blew a series of short or warning blasts to warn some boys on scooters, on his side, headed toward La Porte. He kept a long blast on the whistle crossing the intersection. When the engine came to rest, its bell was still ringing. He said the automatic signal lights were on both sides of the track at the crossing, but he did not notice whether they were in operation at that time. He did remember that the bell on the crossbuck standard was ringing.

In a discovered peril case, it is necessary for plaintiffs to prove that the defendant actually discovered and realized their perilous position in time to have avoided the collision by the exercise of ordinary care in the use of all the means at their command. Parks v. Airline Motor Coaches, 145 Tex. 44, 193 S.W.2d 967 (1946).[1] It is not sufficient that the de-

---

1. There is no question here of the safety of the train or its operators.

fendant should have discovered, or should have realized, the perilous position of the plaintiffs. Safeway Stores, Inc. v. White (1961), Tex., 348 S.W.2d 162; Texas & N. O. R. Co. v. Grace, 144 Tex. 71, 188 S.W.2d 378 (1945). There must be a last chance to avoid the injury, and the last chance must be a clear one. R. T. Herrin Petroleum Transport Co. v. Proctor, 161 Tex. 222, 338 S.W.2d 422 (1960).

◼ On the other hand, the fact of timely realization of the danger may be established by circumstantial evidence. Creech v. Thompson, 156 Tex. 561, 297 S. W.2d 817 (1957). To raise the issue of discovered peril here, it was only necessary for the plaintiffs to show that the defendant realized, in time to have avoided the collision, that plaintiffs were in a position of peril, and were pursuing, and probably would continue to pursue, a course that was likely to result in their being injured. Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561 (1952); Safeway Stores, Inc. v. White, cited just above; Galveston, H. & S. A. Ry. Co. v. Wagner (Tex. Com.App.1927), 298 S.W. 552. The quantum of proof required of the plaintiffs on these elements of discovered peril, in order to entitle them to have the jury pass upon them, was such facts and circumstances as, taken together with all reasonable inferences therefrom, constituted some evidence of probative force of their existence. Ford v. Panhandle & Santa Fe Ry. Co., cited just above.

◼ Viewing the evidence in the light of these principles, it is our opinion that the issue of discovered peril was not raised. There is an absence of proof that the fireman discovered the perilous position of the girls in time to have avoided the collision, or that he failed, after such discovery, to exercise ordinary care in the use of the means at his command to have avoided the injury to them.

The evidence has been set out at length and need not be repeated. The fireman first saw the girls as the cab passed the depot, approximately 100 feet from the crossing. At that point the front of the engine was about 60 feet from the crossing. There is no evidence as to how quickly and within what distance a train, a quarter of a mile in length, consisting of 40 cars, weighing 2,650 tons, might have been stopped or decelerated. The fireman testified that upon seeing the girls and watching them a second or so, a second or two, a moment, an instant, he shouted to the engineer to apply the emergency brakes and that this was done immediately. He also testified that he "immediately" shouted to the engineer. But viewing the testimony most favorably to the plaintiffs, we must assume that a second or two, or a second or so, intervened between the time the fireman saw the girls, realized their peril, and shouted to the engineer.

A discovered peril case which has some facts similar to this case is Martin v. Texas & N. O. Ry. Co., Tex.Civ.App., 236 S.W.2d 567 (writ refused, 1951). The plaintiff there approached the railroad in his car. The railway was switching cars. The engine had stopped some 20 feet from the street, then started slowly toward it at 3 to 5 miles per hour. The fireman saw the plaintiff at 100 to 125 feet as his car approached and realized, when the train was 10 feet from the pavement, that the plaintiff was not going to stop. He shouted to the engineer to "big hole it." The engineer applied the emergency. The Court stated, "An interval of time had to elapse after realization until the fireman could give the signal. A greater interval of time had to elapse to enable the engineer to understand the signal, respond, and apply the brakes." An elapsed time of "two and a fraction seconds" was held to be too short to raise the issue of discovered peril.

In the Creech case, the fireman waited some five seconds after discovering the deceased on the railroad trestle before shouting to the engineer to apply the brakes. There was some evidence that the brakes were not in fact applied before the train struck the deceased. By a divided court, it

was held that the issue of discovered peril was raised. Creech v. Thompson, 156 Tex. 561, 297 S.W.2d 817 (1957).

Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359 (1957), involved a question of time, though it was not a discovered peril case. It was conceded, as held in this Court's original Biggers opinion, that if less than 2 seconds elapsed between the time the Ford driven by Biggers came in front of the defendant's bus, there would be no liability. On rehearing, the Court found that 3½ seconds [or more] elapsed, and that this *was* sufficient time for the bus driver to have reacted and taken some evasive action.

In the present case, the engineer corroborated the fireman's testimony. He said the fireman shouted to him when the cab of the engine was just passing the depot, some 90 feet from the crossing. The front of the engine was then 49 feet from the highway. He put on the emergency immediately, and the train's speed was reduced, he said, by one-third by the time of the collision.

While a jury would be free to disbelieve the testimony of the fireman and the engineer, their testimony is not evidence that the opposite of what they said was true. Safeway Stores, Inc. v. White (Tex.Sup. 1961), 348 S.W.2d 162. We find no other direct evidence; and the facts and circumstances do not point to an earlier discovery or realization on their part, or that they did not exercise ordinary care in the use of the means at hand to avoid the collision. The girls said they didn't see the engine until it was upon them. Neither girl had any idea of the train's speed or its actions. The eye witness, Lee Gadman, gave no testimony which aided the girls. His testimony was that the warning signal was working, bells ringing, whistle blowing, and that the girls' car came to a stop but 50 feet down the track.

Counsel for the girls argues that there is proof that the engine's operators did not ·exercise ordinary care with all of the means at their command to avoid the injury because the fireman did not apply the emergency brake which was on his side. The burden was upon plaintiffs to prove that there *was* an emergency brake on the fireman's side. There is no direct proof that there was. The fireman, who had been on this particular engine only a few times and never since the accident, testified that such valves were new equipment and were coming out, but that he did not know whether there was one on this engine or not. The engineer said he did not know either whether this particular engine had one emergency valve or two; he knew there was one on his side. He conceded that he *had* said on deposition that he was sure there was one. But on the trial, he repeated that "I'm not so positive." Assuming that this raises an issue as to whether there was such a valve, our conclusion is that, even so, the operators of the engine did all they could in the time which they had, by the exercise of ordinary care, to avoid the collision after the discovery of the girls.

There was but a very brief period of time involved here. This Court has held that the basis for recovery on discovered peril rests on humanitarian doctrines: a person seeing another in a position of peril, and recognizing the danger in time to avoid it, nonetheless negligently fails to use the means at hand to avoid it. The dereliction of duty alleged, it is said, is an act of inhumanity which should never be imputed in the absence of competent evidence warranting an inference of guilt. Texas & N. O. Ry. Co. v. Grace, 144 Tex. 71, 188 S.W.2d 378 (1945). Parks v. Airline Motor Coaches, 145 Tex. 44, 193 S.W.2d 967 (1946); Sugarland Industries v. Daily, 135 Tex. 532, 143 S.W.2d 931 (1940); Schuhmacher Co. v. Posey, 147 Tex. 392, 215 S. W.2d 880 (1949). It is our own opinion that a pause of a second or so, or a second or two, on the part of the fireman as he watched the girls approach at 35 to 40 m. p. h., and realized their position, was not under the circumstances sufficient to raise the issue of discovered peril.

Counsel for the girls argues that there is evidence from which the jury could infer that the fireman discovered the girls' car *before* the cab of the engine passed the station. This is based on the isolated statement by the fireman that he saw the girls when their car was first within his sight range. There was nothing to obstruct his view from his position at the switch, 1000 feet from the highway, except the depot and whatever freight cars were on the spur track. Assuming that this is the import of his testimony [and we do not think it is], the girls' car was visible well back from the crossing. The testimony gives no point at which the vision was obstructed back to the point where the girls turned onto the Spencer Highway, a half mile from the crossing. At points remote from the crossing, the girls, traveling at 35 to 40 m. p. h. (or less as they started from the stop sign) were not in a position of peril. The language of the Ford case is apposite here:

"When the fireman first discovered the approach of the automobile he had a right to assume that the driver would stop it [the car] before reaching the crossing. Both ordinary care for his own safety and Article 6701d, Sec. 86 (d), Vernon's Ann.Civ.St. required that he stop it." Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561, 567.

As the engine approached the highway, it went behind at least one box car on the spur track and the depot. These were obstructions to vision. When the cab came from behind the depot, the fireman testified plainly that he discovered and realized the peril of the girls. At this point the girls were still approximately 100 feet from the crossing. This opinion has assumed that they were in a position of [discovered] peril from that time, but not before.

■ Our holding that the issue of discovered peril was not raised disposes of the claim of the driver, Mary McCormick, who was found by the jury to have been contributorily negligent. But her negligence is not imputed to Melba Hart, her guest. As to Melba Hart, the jury found that the railroad was negligent (1) in failing to have a watchman stationed at the crossing; (2) in failing to have its warning signal light in operation on her side; and (3) in failing to provide adequate warning for the extrahazardous crossing.

■ We think the evidence, set out above, does not amount to credible testimony that there were no railroad warning blinker lights at the crossing. At most it amounts to testimony that they were not in operation on the girls' side at the time of the accident. The issue submitted to the jury was not whether there *were* such signals but whether they were in operation. Since the railroad had automatic blinker lights at the crossing, they were not required, at least under the circumstances here present, also to have a flagman. Galveston, H. & S. A. Ry. Co. v. Wells, 121 Tex. 310, 50 S.W.2d 247, 251 (1932).

But the jury found that these warning lights were not in operation. We think the evidence set out above raises an issue as to whether they were or were not in operation. The fireman, an interested witness, testified they were working. The engineer did not notice. Gadman said they were working on his side and he thought they were working on the other, but he couldn't be sure. While the girls, as found by the jury, were not keeping a proper lookout and did not even see the train, they testified that they were looking straight ahead and saw no warning lights. The issue is close, but we cannot say that there is no evidence that the lights were not working. The Court of Civil Appeals did not pass upon whether there was sufficient evidence to support the jury's answer thereto. The case will therefore be returned to that Court for that purpose.

There is a general finding of the jury that the railroad failed to provide adequate warning at the crossing. The only suggested ways of warning were: flashing light signals, a flagman, the blowing of whistles,

and the ringing of bells. We have dealt with the flagman and the flashing light signals. The jury made specific findings that the railroad did not fail to ring its bell or blow the whistle. Gadman, the eye witness, heard both and stopped because of them. The answer to the general issue on inadequate warning therefore adds nothing and is not controlling. Sproles v. Rosen, 126 Tex. 51, 84 S.W.2d 1001, at 1003 (1935).

One question remains: the jury found that the warning signal lights were not in operation and that this failure constituted negligence and a proximate cause. The railroad says that no issue was raised for the jury, and that as a matter of law, it is not liable because, even assuming the signal was not working, there is no proof of negligence on its part; that there is no evidence as to how long the signal had been inoperative, no proof that it knew it was inoperative, and no proof that it should have known.

We do not have here the question as to whether the failure of the warning devices to operate at an extrahazardous crossing constitutes negligence as a matter of law. The question was submitted to the jury which found that it did constitute negligence. Our view is that it is the duty of the railroad to warn at such a crossing. It may give warning in a number of ways. Where it elects to warn by the use of an electric flashing light device, the burden is upon it to see that the device operates. Otherwise, at least as to the mechanical part of the device, it gives no warning.

There may be reasons why a device is inoperative. For example, there could have been a power failure through no fault of the railroad. The device may have been struck by lightning, knocked down or broken by a third party. No reason is given or suggested here. Assuming that the signal lights were not working, we think their unexplained failure to work raised an issue of negligence for the jury. See Annotation, 53 A.L.R. 973.

As to Mary McCormick, this cause is reversed and judgment is here rendered for the petitioner, the defendant in the trial court. As to Melba Hart, the cause is reversed and remanded to the Court of Civil Appeals for further proceedings in accordance with this opinion.

The STATE of Texas, Petitioner,