UNITED STATES FIRE INSURANCE COMPANY, Appellant,

v.

HEATON CATTLE COMPANY, Inc., Appellee.

No. 7214.

Court of Civil Appeals of Texas, Beaumont.

Jan. 14, 1971.

Rehearing Denied Feb. 4, 1971.

O. P. Fields, Jr., Amarillo, for appellant.

Ross N. Buzzard, Pampa, for appellee.

PARKER, Chief Justice.

The insurance company appeals from a verdict allowing a recovery upon a policy of insurance which it had issued to the appellee, the coverage clause reading:

"Covering livestock consisting of cattle, * * * while held for feeder purposes, while contained in the Insured's stock pens and feed lots, at or near 12 miles east of Pampa, Texas S/W Quarter of Section #176 or within 200′ thereof, against the perils indicated below, subject to the condtions [sic] of this policy."

The policy also contained another provision reading:

"It is warranted that the Insured shall use due diligence in removing livestock to a place of safety in the event of fire or other perils covered hereunder, and any loss or casualty resulting from such removal shall be covered by this policy."

Heaton Cattle Company, the insured, operated a feed lot, and on the occasion in question had approximately 12,000 head of cattle in the pens being fattened for the market. The particular herd involved in this litigation consisted of crossbred Mexican cattle of Brahma origin received by the cattle company a week or ten days before the events involved herein. These cattle had been given their shots, branded, and then turned into a wheat pasture adjacent to the feeder pens. They were "thin cattle" and the veterinarian testified that they were particularly vulnerable to severe weather conditions.

On the afternoon of March 27, 1970, there was a severe change in the weather when a frontal passage lowered the temperature from about fifty degrees to thirty degrees within a matter of a few hours. Bill Stockstill, an officer and principal stockholder of the cattle company, was present at the pens during the passage of the front and had cowboys present to assist him in taking such steps, if any, as were deemed advisable to protect the cattle. He took no protective action and the weather worsened during the night, with increasing wind velocity, lowered temperature, and snow. The witnesses described the phenomena as a blizzard. The next morning, eighty head of the Mexican cattle were found dead outside, but within 200 feet, of the pens. The veterinarian testified that the death of the cattle was caused by the effects of the windstorm, a fact accepted by the jury.

The jury found: (1) that the cattle which died "were contained in the insured's stock pens and feed lots" on the occasion in question; (2) that they were being held "for feeder purposes"; (3) that there was a windstorm on the night of March 27–28, 1970; (4) that the windstorm "was the dominant and efficient cause of the death of the cattle"; (5a) that "the personnel of Heaton Cattle Company failed to use due diligence in removing the livestock in question to a place of safety"; (5b) that such was a proximate cause of the death of the cattle; (6) that it was possible "on the occasion in question, to remove the cattle to a place of safety"; and (7) that the market value of the cattle was $11,200.00.

The court sustained the insured's motion to disregard the findings of the jury in response to Special Issues Nos. 5a, 5b, and 6, on the ground that there was no evidence to support such answers and entered judgment against the insurer for the value of the cattle as found in answer to Special Issue No. 7.

In this case tried to a jury, the insurance company did not file a motion for new

trial and we are, therefore, precluded from considering any alleged errors except those arising out of the court's action under Texas Rules of Civil Procedure, rule 301 in rendering judgment for appellee after setting aside the findings of the jury in response to Special Issues Nos. 5a, 5b, and 6, supra. Rule 324; Wagner v. Foster, 161 Tex. 333, 341 S.W.2d 887, 890 (1960); St. Louis Southwestern Railway Company v. Duke, 424 S.W.2d 896, 898 (Tex.Sup., 1967).

By the first three points in its brief, the insurer attacks the action of the trial court in rendering judgment after disregarding the findings of the jury as to the lack of diligence of the cattle company in removing the cattle to a place of safety. We are in accord with the contentions so advanced with reference to the sufficiency of the evidence to show lack of diligence on the part of Stockstill and his helpers. There were empty pens available and no efforts were made to move the Mexican cattle from the exposed pasturage to the feeder pens. However, our analysis of the record does not lead us to sustain the points so urged.

The issues, as framed by the court, all assumed the major premise, i.e., that there was actually a place of safety to which the particular cattle could have been moved in the exercise of reasonable diligence. Only Stockstill and the veterinarian testified upon the point, the insurer not offering witnesses upon this facet of the matter. Stockstill, admitting that he had empty pens that could have been used, excused his action by saying: "We could have brought them in if we had wanted to, but, hell, there wasn't any storm" when he was at the pens late in the afternoon.

However, he also testified:

"Q. Is [was] there any place out there that you would regard as a place of safety?

"A. Not with these particular cattle."

Stockstill continued in this vein:

"Q. What was wrong with these particular cattle?

"A. Well, these cattle had just come in, and you can take a crossbred Brahma like that, they are more or less kind of —if we had them in a pen, they would have just piled up on top of each other, and probably [we] would have had a bigger death loss than we did where they were."

"Q. Does the weight, whether a cow is thin or fat, does that have anything to do with whether they survive or not?

"A. It makes a big difference."

We note in passing that when the veterinarian first made his examination of the dead cattle, he "was looking for piling up, * * * I saw no evidence of stacking up; no hoof marks on others."

Under the policy provision forming the basis of this series of issues, it was the obligation of the insured to move the cattle to a place of safety, but the only witnesses on the subject denied the existence of any such place of safety. Stockstill was an interested witness; but, as was said in R. T. Herrin Petroleum Transport Co. v. Proctor, 161 Tex. 222, 338 S.W.2d 422, 427 (1960):

"Barron was an interested witness and his testimony was not binding upon a jury. Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561. However, testimony from an interested witness, while it need not be accepted as true by a jury, is not evidence that the exact opposite of what the witness said is true. There must be some circumstance supporting the conclusion that a situation opposite to that depicted by the witness actually existed."

See also: Safeway Stores, Inc. v. White, 162 Tex. 473, 348 S.W.2d 162 (1961); Texas & New Orleans Ry. Co. v. Hart, 163 Tex. 450, 356 S.W.2d 901, 907 (1962).

The testimony does support the inference that the cattle confined in the feeder pens,

some 12,000 in number, suffered only normal attrition on the night in question, approximately one and one-half per cent of the total. On the other hand, the Mexican cattle involved herein, which were loose upon the wheat pasture, suffered a much greater mortality rate, approximating twenty-five per cent of the total. From this premise, the insurer argues:

"It is reasonably deducible from this testimony that the area within the stock pens was a place of safety for the cattle in question as opposed to their location totally exposed upon wheat pasture."

The argument does not take into consideration the peculiarities of the Mexican cattle, their thin condition, their propensity to stack or pile up; nor does the record support any precise comparison between the type of cattle in the pens and those involved in this suit.

In essence, we are asked to take judicial knowledge of the fact that the cattle in feeder pens were in a safe place, while those on the wheat pasture were in an unsafe place. Further, we are asked to substitute our judicial knowledge of facts for those based upon the testimony given during the trial. This we are unwilling to do.

Dean Wigmore [Wigmore on Evidence (3rd Ed.), Vol. IX, § 2580, pp. 605, et seq.] gives many illustrations of particular facts relating to commerce and industry of which the courts have taken judicial knowledge. Similarly, Professor McCormick [McCormick & Ray, Texas Law of Evidence (2nd Ed.), Vol. 1, § 187, pp. 212, et seq.] collates the Texas cases upon the subject. However, we have found no case in which an appellate court has substituted its own judicial knowledge of a business fact contrary to that found in the testimony of the witnesses given upon the trial of the cause. The feeder pens may have been a place of safety for the particular cattle involved herein, but such fact was a matter of proof upon the trial of the cause and not one for judicial speculation upon appeal.

In testing the validity of the points under consideration, we have followed the rule enunciated in C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191, 193 (Tex. Sup., 1966):

"To test whether the trial court erred in holding that the answers to the issues have no support in the evidence, we must consider only the evidence and the reasonable inferences therefrom which support the answers. Biggers v. Continental Bus System, 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359, 363 (1957); Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696, 698 (1914)."

Having reviewed the record under the appropriate standards, we are constrained to overrule the points under consideration. There was no evidence offered which provided support for the implied finding that there was in fact a place of safety to which the cattle could have been moved.

Having found no error in the only points entitled to consideration, the judgment of the trial court is in all things affirmed.