Mrs. Paula GARCIA, Appellant,

v.

BURLINGTON NORTHERN, INC., et al., Appellees.

No. 945.

Court of Civil Appeals of Texas, Tyler.

Oct. 28, 1976.

Rehearing Denied Dec. 2, 1976.

John C. Connolly, Houston, for appellant.

Clinton S. Morse, Andrews, Kurth, Campbell & Jones, Houston, for appellees.

MOORE, Justice.

This is an automobile-train collision case involving an application of the doctrine of discovered peril.

Mrs. Paula Garcia, hereinafter referred to as appellant, filed suit against Burlington Northern, Inc.; Chicago Rock Island and Pacific Railroad Company; Fort Worth and Denver Railway Company; and Emory E. West, engineer, under the Texas Wrongful Death Act and Texas Survivor's Statutes for personal injury and wrongful death of her husband, Albert A. Garcia, and her son, Richard Garcia. The jury exonerated the railroad companies and the engineer of any act of primary negligence and found contributory negligence on the part of the deceased driver of the automobile, Albert A. Garcia, in that (1) he was guilty of failure to keep a proper lookout, (2) he failed to apply his brakes, and (3) he failed to stop within 50 feet and not less than 15 feet from the track which constituted negligence per se under Tex.Rev.Civ.Stat.Ann. art. 6701d sec. 86 when the train was plainly visible and was in hazardous proximity to the crossing in question before deceased's automobile reached a point 15 feet from the nearest rail of the railroad track. The jury further found that each of these acts of contributory negligence was a proximate cause of the collision. Pursuant to such findings the trial court rendered judgment on the verdict that appellant take nothing, and she has prosecuted this appeal.

Upon oral argument before this court, appellant waived all points of error assigned in her brief, save and except the point of error urging that the trial court erred in refusing to submit her requested issues seeking a recovery based on the doctrine of discovered peril.

There is a sharp contradiction between the theory of the appellant and that of the appellees as to how the collision occurred. While the appellant takes the position that there was some evidence establishing the elements of discovered peril and therefore such issues should have been submitted to the jury, the appellees contend that the evidence in the record before us shows conclusively, and as a matter of law, that the agents, servants and employees of the railroads did not discover the deceased's peril in time to avoid the collision. The appellees further contend that the evidence shows conclusively, and as a matter of law, that the operators of the train used all of the means at hand to avoid the collision once they discovered the plaintiffs' perilous position.

In order to establish a cause of action predicated on the doctrine of discovered peril, appellant was required to prove (1) that the deceased was in a position of peril, (2) that either the engineer or the brakeman discovered his peril, (3) that the engineer or brakeman realized that the deceased, in reasonable probability, could not or would not extricate himself from his peril in time to avoid the injury, (4) that the engineer or brakeman discovered and realized such peril of deceased within such time and distance that by the use of ordinary care they could have avoided the collision, (5) that the engineer or brakeman failed to exercise ordinary care to use all means at his command to avoid injury to deceased; and (6) that such failure was a proximate cause of the death of Garcia and his minor son. The plaintiff bore the burden of proof on each of these issues. It is not sufficient that the defendant could have or should have realized the perilous position of the plaintiff, but rather, the plaintiff must show actual discovery and realization by defendant in time to avoid the collision. *Gentry v. Southern Pac. Co.,* 457 S.W.2d 889 (Tex.1970); *Texas & N. O. Ry. v. Hart,* 163 Tex. 450, 356 S.W.2d 901 (1962); *Safeway Stores, Inc. v. White,* 162 Tex. 473, 348 S.W.2d 162 (1961); *R. T. Herrin Petroleum Transp. Co. v. Proctor,* 161 Tex. 222, 338 S.W.2d 422 (1960); *Parks v. Airline Motor Coaches, Inc.,* 145 Tex. 44, 193 S.W.2d 967 (1946).

In determining whether the plaintiff has adequately discharged this burden, we

must view and interpret the evidence in the record in the manner most favorable to the appellant, disregarding all evidence and inferences therefrom favorable to the appellees. *Triangle Motors v. Richmond,* 152 Tex. 354, 258 S.W.2d 60 (1953); *Ford v. Panhandle & S. F. Ry.,* 151 Tex. 538, 252 S.W.2d 561 (1952).

The collision occurred at about 3:00 p. m. near the outer city limits of the City of Houston, Texas, where the appellee's track crosses West Little York Road. At the point of the collision, the track crosses the road at approximately a right angle and runs north and south. The deceased was driving west on West Little York Road as the train approached from the north. The weather was clear to partly cloudy and the visibility was good. The train in question consisted of four diesel engines, 121 freight cars, weighed 12,000 tons and was over a mile in length. The view of the crossing was unobstructed so that a motorist traveling west on West Little York Road, as deceased was traveling, could have observed the approaching train long before it or his car would reach the crossing. The evidence shows that from a point on the highway 300 feet east of the crossing, the train would be visible for at least a mile before it reached the crossing. Although the crossing was not equipped with any type of automatic warning signal, the usual black and white crossing signs known as "crossbucks" were in place near the crossing and there was a yellow and black highway warning sign on the right-hand side of West Little York Road at a point approximately 350 feet east of the crossing. There is nothing in the evidence to indicate that the crossing was an extra hazardous crossing and the jury so found. At the time of the accident, the deceased and his minor son were proceeding to their home which was located a short distance east of the crossing.

J. E. Campbell, the trainman or brakeman, testified that as the train approached the crossing going south, he was sitting on the left of the lead engine, the side from which the deceased approached; that he was situated 10 to 12 feet above ground

level and could see down West Little York Road several hundred feet because the road curved so that it ran almost parallel to the track after it reached a point approximately 300 feet east of the crossing; that he first saw the automobile when it rounded the curve in the road at a point approximately 400 feet from the crossing and he estimated the speed of the automobile to be 30 miles per hour. He testified that at that point the train was approximately 600 feet from the crossing and was traveling at a speed of approximately 30 to 40 miles per hour. Campbell further testified that he continued to keep the automobile in view and had no reason to become alarmed since the automobile was being driven in a normal manner and was not proceeding at a high rate of speed and under these circumstances he had no reason to believe the driver would not stop; that as he watched the automobile approach the crossing it slowed down as if it would stop; that at a point approximately 30 to 45 feet from the crossing the automobile had slowed to approximate 15 miles per hour and by the time it was about 20 feet from the crossing it had slowed to approximately 6 to 7 miles per hour but when it reached a point about 10 feet from the crossing the driver suddenly accelerated as if to get across ahead of the train. At that point Campbell testified that he told the engineer, "It's going to hit" or words to that effect. Simultaneously therewith, or a little before, the engineer, who was also watching the automobile, applied the emergency brake. Campbell estimated that at the time the train went into emergency the front of the engine was approximately 40 feet from the crossing. He further testified that although there was an emergency brake valve situated on his side of the train about 3 feet from where he sat, he did not attempt to use it because at the same time he realized the deceased was attempting to get across ahead of the train, the engineer had already placed the train in emergency.

The engineer, Emory West, testified that he was seated on the right side of the engine cab, thus sitting on the opposite side from the brakeman. He estimated the speed of the train as it approached the

crossing to be 35 to 36 miles per hour. He testified that he first saw the Garcia automobile when it was 200 to 250 feet from the crossing and at that time the automobile was traveling approximately 25 to 30 miles per hour; that the vehicle seemed to be making a normal approach and it appeared to him that the driver was decreasing his speed; that at a point approximately 50 feet from the crossing the deceased was traveling at about 15 miles per hour and it appeared that the automobile would stop. At that point, West testified the deceased suddenly accelerated the speed of his automobile and by the time the automobile reached the crossing West estimated the speed of the automobile to be 25 miles per hour. He testified that when he realized the deceased had accelerated his speed and would attempt to beat the train across the crossing, the engine was approximately 50 feet from the crossing at which time he immediately applied the emergency braking system; that although the brake slowed the train by approximately one to two miles per hour, due to the weight and momentum of the train, it was impossible to stop before striking the center of the automobile; and that after the train struck the automobile it traveled approximately 2200 feet before coming to a stop. According to his testimony, a train of this weight traveling at 35 to 36 miles per hour could not be brought to a stop in less than 2200 feet after application of the emergency brake. Finally, West testified that as he approached the crossing he constantly blew the whistle and rang the bell.

Ron Johnson, an accident investigator called by appellant, testified that at a point on West Little York Road 180 to 200 feet east of the crossing a motorist could see the train several thousand feet before it reached the crossing. At a point 550 feet from the crossing a motorist could also see the train several thousand feet before it reached the crossing but between these two points there were shrubs and bushes that would obscure the vision of the train. In the course of Johnson's testimony the appellant propounded the following hypothetical question: Assuming that the brakeman first saw deceased when the train was 600 feet from the crossing, and assuming the train continued to travel at 45 miles per hour as testified by the brakeman, and assuming as the brakeman also testified, that when he first saw the deceased, the deceased was 400 feet from the crossing traveling at 30 miles per hour and slowed to a point 15 to 20 feet from the intersection to 7 to 10 miles per hour, would the front end of the train have collided with the automobile? Johnson answered that it would not, explaining that if the automobile slowed down as testified to by the engineer and brakeman, the front end of the train would not have collided with the deceased because the deceased's automobile would not have reached the track. He further testified that the only way for the accident to have happened under the hypothetical fact situation would have been for the speed of the automobile to have remained constant. Johnson also testified that if the automobile had traveled at the rate of 35 miles per hour and the train had been slowed by one-third of a second, then the automobile would have crossed the track ahead of the train.

Michael Price, age 17, testified that he was a high school student at Aldine High School. On the date of the accident, he and his girlfriend and another couple were returning home from school in his girlfriend's automobile which he was driving. On their route home they had crossed the railroad track on two previous occasions that afternoon and had seen the train and at that time the train's headlight was not on. After crossing the track the second time, they proceeded south to Alabonson Street which was located about 375 feet east of the railroad track and ran approximately parallel to the track. They then proceeded south on Alabonson Street to a point where it intersected West Little York Road. At this point they stopped at a stop sign. While awaiting for the traffic to clear, Price testified that he observed the Garcia vehicle traveling west on West Little York Road toward the railroad track. He estimated the speed of the deceased's automobile to be

35 to 40 miles per hour. He testified that he watched the vehicle, without taking his eyes off of it until he saw the train and automobile collide. He also testified that at no time did the deceased's vehicle slow its speed, nor did it increase its speed during the 375 feet it traveled as he observed it. While he testified that he did not see the brake lights of the automobile come on, there is no evidence that the brake lights were in proper working order at the time in question. He estimated the speed of the train to be 40 to 50 miles per hour and testified that he did not hear the train's whistle or bell at the time of the accident. He further testified that the wheels on the locomotive were not locked at the time of the collision. Price admitted that from where he was situated he could only see the rear end of deceased's vehicle as it traveled the entire distance toward the crossing. Photographs and other exhibits demonstrate this statement to be correct. The witness, Ron Johnson, testified he had measured the distance between the track and the point on Alabonson Street from which Price observed the accident and found it to be 391 feet.

J. R. King, an expert witness called by the appellees, testified that the braking system on the train was not designed so that the application of the emergency brake would cause the wheels on the locomotive to lock. He explained that if the wheels locked, the wheels would slide on the track and would take longer to slow or stop the train.

Our question is whether there is evidence of probative force to support all of the elements necessary to establish a cause of action founded on discovered peril. It is obvious that at some point the deceased was in a position of peril. There is no question that the operatives of the train discovered the deceased prior to the collision because they so testified. It becomes necessary, therefore, to determine whether there was any evidence of probative force showing that the operatives of the train realized, in time to have avoided the collision, that the deceased was in a position of peril, and was

pursuing, and probably would continue to pursue, a course which would likely result in his injury. *Texas & N. O. Ry. v. Hart*, supra.

■ Discovery "in time" is one of the essential elements in the establishment of liability under discovered peril. *Parks v. Airline Motor Coaches, Inc.*, supra; *Turner v. Texas Co.*, 138 Tex. 380. 159 S.W.2d 112 (1942). Here, as in most cases involving the doctrine of discovered peril, the vital issue becomes the element of time, and, as is so often the case, the critical period is depicted by fuzzy approximations of speed, distance, reaction time and braking time.

The only direct evidence as to when the train operatives discovered that deceased was in a perilous position and would not extricate himself is to be found in the testimony of the engineer and the brakeman. According to their testimony, it appeared to them that the deceased was going to stop, but his actions proved to be deceptive because at a point 30 to 50 feet from the track he suddenly accelerated his speed as if to beat the train across. They testified that at the time they discovered that the deceased was in a position of peril and probably could not extricate himself, the train was approximately 40 to 50 feet from the crossing and although the emergency brake was applied immediately, it was impossible to slow the train or stop it in such a short distance due to its weight and momentum. We must, of course, disregard this testimony as adverse to appellant, but in so doing we are left with no direct testimony as to when the operatives of the train actually discovered the perilous position of the deceased.

■ Appellant urges that the discovery of peril, in time to avoid injury, may be proved by circumstantial evidence. We agree, but we note that there must be facts and circumstances demonstrated from which reasonable inferences may be drawn with at least some degree of accuracy. As we view the record, the circumstantial evidence is not of sufficient probative force to warrant submission of the cause to the jury on the issue of discovered peril. While ac-

tual discovery of the injured party's perilous situation may be established by circumstantial evidence, the circumstances must be such as to fairly warrant the inference that there was actual discovery or actual knowledge of the perilous situation in time to have avoided the injury. *Dupree v. Burlington-Rock Island Ry.,* 251 S.W.2d 559 (Tex.Civ.App.—Galveston 1952, writ ref'd).

■ The doctrine of discovered peril does not make it the duty of the operatives of a train to bring it to a stop every time they observe a vehicle approaching a crossing. *Terrall v. Midwest Farms Div. of Southland Corp.,* 494 S.W.2d 633 (Tex.Civ.App.—Texarkana 1973, no writ); *Texas & N. O. R. R. v. Grace,* 144 Tex. 71, 188 S.W.2d 378 (1945). If the operator of a train does not make such discovery and does not achieve such realization in time to avoid the injury, the doctrine of discovered peril does not apply. *Texas & N. O. R. R. v. Grace,* supra.

Appellant contends that the testimony of the operatives of the train and the testimony of Michael Price, when construed most favorably to her, show that at the time the train was 600 feet from the crossing traveling at 45 miles per hour, the automobile was 400 feet from the crossing traveling at 30 miles per hour and that these circumstances were sufficient to establish that the automobile and the train were on a collision course and remained on a collision course until the instant of the collision. Appellant argues that the brakeman had actual knowledge of these facts and should have warned the engineer to stop the train before the train reached a point only 50 feet from the crossing and that the failure to put the train in emergency before reaching a point 40 to 50 feet from the crossing was negligence and but for such negligence the train would have been slowed enough to permit the deceased to have crossed the track in safety.

■ In order to establish circumstantially that the operatives of the train had knowledge of the fact that the train and the deceased were traveling on a collision course, it would be imperative that appellant offer some proof that the deceased's

rate of speed remained constant at the rate of 30 miles per hour from the time he was first observed by the fireman until the moment of the collision. We fail to find any evidence of probative force to establish such fact. The brakeman did not so testify. On the contrary, he testified the deceased continually slowed his speed until shortly before the collision when he accelerated his speed. While the witness, Michael Price, testified that the deceased's speed remained constant throughout the last 375 feet before the collision, he testified that the deceased was traveling at the rate of 35 to 40 miles per hour. Under his testimony the two instrumentalities could not have been traveling on a collision course. If his testimony as to the deceased's speed is correct, the automobile would have no doubt passed over the crossing before the train arrived. In any event, we do not believe that his testimony that the speed of the deceased's vehicle remained constant from the time he first saw it until the time of the collision was of sufficient probative force to show that the operatives of the train were charged with knowledge that a collision would probably occur. Being situated at a point directly behind deceased's vehicle as it traveled the 391 feet toward the crossing, he was in a poor position to determine whether the speed remained constant. As we view it, his testimony raises no more than a surmise or suspicion of the fact sought to be established and constitutes nothing more than a mere scintilla: *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059 (1898); *Murphy v. Whitehurst,* 300 S.W.2d 758 (Tex.Civ.App.—San Antonio 1957, ref'd n. r. e.). In the absence of some probative evidence showing that the speed of deceased's vehicle remained constant at 30 miles per hour from the time it was first observed by the brakeman until the time of the collision, it cannot be inferred that the operatives of the train had knowledge of the fact that they were on a collision course with deceased's vehicle and that they would arrive at the crossing at precisely the same time.

While the fact that the deceased continued to approach the crossing should have

alerted the engineer and brakeman of the danger, such does not constitute evidence that they actually discovered the deceased's peril and realized he could not extricate himself in time to have avoided the collision.

When the operatives of the train first discovered the deceased approaching the crossing, they had a right to assume that he would stop before reaching the crossing. Both ordinary care for his own safety and Tex.Rev.Civ.Stat.Ann. art 6701d, sec. 86 required the deceased to stop at least 15 feet before reaching the crossing. Therefore, the operatives of the train had a right to regulate their conduct accordingly. Unless the injured driver is inattentive to the danger and operatives of an oncoming train are aware of this fact, the operatives of a train are entitled to assume that the driver is in possession of his normal faculties, and that he will either stop or that he will not attempt to cross ahead of the train unless he can do so at a rate of acceleration which will enable him to cross safely. There is no evidence whatever in this case that the deceased was inattentive, or if he was, that the operatives of the train were aware of it.

The perilous position in a crossing collision such as this arises only when the operatives of a train realize that the automobile driver cannot or will not extricate himself and that a collision is imminent. It is not until this instant that a duty devolves upon the operatives of a train to use the means at their command to avoid the collision. *Sisti v. Thompson*, 149 Tex. 189, 229 S.W.2d 610 (1950); *Terrall v. Midwest Farms Div. of Southland Corp.*, 494 S.W.2d 633 (Tex. Civ.App.—Texarkana 1973, no writ).

In order for appellant to have established a case for the jury on discovered peril, it was essential for the appellant to have offered evidence which would support a reasonable inference that there was an actual discovery or that the operatives of the train had actual knowledge of the perilous situation in time to have avoided the injury. The "could have" or "should have" standard for measuring the proof required to raise the discovery issue is not recognized in this state. *Safeway Stores, Inc. v. White*, 162 Tex. 473, 348 S.W.2d 162 (1961). Also there must have been time, after discovery of the peril and lack of possible extrication, for mental reaction, as well as action to avert injury. *Terrall v. Midwest Farms Div. of Southland Corp.*, supra.

Upon disregarding the testimony of the operatives of the train as to when they actually discovered deceased's perilous situation, we are left without any testimony or inference as to how far the train was from the crossing when the discovery of the peril and realization occurred. Without any evidence to support a reasonable inference that the operatives of the train actually discovered or had knowledge of the perilous situation before the time they admitted having such knowledge, it is only possible to speculate as to whether they gained knowledge of the perilous situation before they said they did, and if so, whether they gained such knowledge in time to avoid the collision. There is no evidence that an earlier application of the emergency braking system would have slowed the train enough to have avoided the collision. Therefore, a finding by the jury of such facts would have been based entirely upon speculation and thus, appellant's reliance on the holding in *Ford v. Panhandle & S. F. Ry.*, supra, is misplaced. There is a marked distinction between the present case and *Ford* in that the movements of the automobile under the evidence were reasonably predictable in the Ford case. There the testimony of the fireman showed that at a specific point at a considerable distance he was aware of the peril well before the train reached the crossing. Furthermore, in *Ford* there was evidence showing that an application of the emergency brake at anytime before the train reached the crossing would have afforded the necessary time for the automobile to have passed over the track unharmed. In the present case, there is no evidence showing that the movement of the automobile was reasonably predictable. The operatives of the train in the instant case certainly did not admit that the movement of the automobile was predictable as the fireman had admitted in *Ford*.

We have carefully reviewed the evidence presented and have concluded that it failed to raise the issue of discovered peril.

The judgment is accordingly affirmed.