**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Appellant,**

v.

**Raymond ACOSTA, Appellee.**

**No. 15382.**

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Dec. 12, 1968.

Rehearing Denied Jan. 9, 1969.

Chilton O'Brien, Beaumont, and McLeod, Alexander, Powel & Apffel, Galveston, of counsel, for appellant.

Davis, Davis & Hornbuckle, Wm. E. Hornbuckle, III, Huntsville, for appellee.

COLEMAN, Justice.

This is a suit for damages growing out of a collision between a freight train operated by appellant and a truck owned and operated by appellee. Based on a jury verdict the trial court entered a judgment for appellee in the sum of $20,831.60.

On September 27, 1966, appellee was driving a large truck loaded with hay along a clearly defined road from a hay field south of a railroad track to a barn north of the track when the truck was struck by a freight train composed of two diesel engines and twenty-six cars traveling in a westerly direction. Henry Zaragoza, one of appellee's employees, was in the cab of the truck at the time of the collision. Two men employed by Dr. Walton, the owner of the farm, were engaged in mowing and baling hay in a field nearby.

There was a fence about fifty feet from the center line of the railroad track on each side of the track. It was admitted that the right-of-way extended to the fence line. Trees had grown up in the fence row on the south side of the track with a large cluster of them beginning about 480 feet east of the road and north of the fence row. Weeds and Johnson grass were growing between the fence row and the track. There was testimony that once each year one of Dr. Walton's employees would mow

the right-of-way on both sides of the track. There is a dispute in the evidence as to whether this area had been mowed prior to this accident.

Appellee testified that on this trip he stopped past the fence line from 25 feet to fifty feet from the track, put the truck in low gear, and proceeded up a slight incline toward the crossing. He testified that while he was stopped he looked both east and west, but that he could not see the train because of the tall Johnson grass and other growth. He heard no whistle or bell. He could not see down the track until his front wheels were on the second rail of the track. The train was then very near the crossing. He accelerated his speed to try to get the cab across the track and the train hit the truck bed and slung the cab into the side of the engine. The truck ended up against the fence row on the north side of the track 90 to 100 feet from the crossing. Appellee was thrown to the bottom of the cab with his feet sticking up in the air.

Zaragoza, who has also filed a suit for damages, testified that he looked to the east when the truck stopped, but could see nothing because of the brush. He heard no whistle or bell, and the first warning he had of the approach of the train was when the truck started upon the track and he heard the clicking of the train wheels. He tried to warn appellee. He attempted to open the door to jump out, but it was too late. He was thrown from the truck on the north side of the track. He is between 5′ 10″ and 5′ 11″ tall. The conductor told him that the whistle blew at the last crossing. He also testified that this crossing is about one and one-half miles away. It was hot. The windows were down and there was no radio. The train did not blow its whistle or ring its bell. The weeds were taller than shown in the picture. (D's No. 5)

The truck approached the track from the conductor's side of the track. He was sitting on the left side of the cab. He testi-fied that he first saw the truck when it came past the fence row, "just at the right-of-way," * * * "as it was coming around this little bush here." (Referring to D's Exhibit No. 13) The truck was going about ten miles an hour and did not stop. The train was about 150 feet from the crossing at that time. He thought the truck would stop until it got about ten feet from the crossing. The train was going about thirty miles an hour. When he first saw the truck, he advised the engineer, who made an application of the brakes. When he realized that the truck was not going to stop, he told the engineer to "big-hold-it." The train was then 100 feet to 125 feet from the crossing. The whistle was blowing and the bell was ringing. On cross-examination he testified that he first saw the truck when he was 350 feet from the crossing.

The engineer testified that he saw may-be a foot of the hood of the truck before the collision. The conductor told him that a truck was coming and that it looked like it was not going to stop. He applied the emergency brake. The train was traveling between 33 and 34 miles per hour. He tes-tified that the only signal he gave was the whistle. He also stated that he usually rang the bell, but that he did not know whether it was ringing or not. He had never seen a car at that crossing before, but he had seen evidence on both sides of the track that the road had been used. There was no whistle board on the right-of-way as is customary at public crossings. He thought the train was 150 to 200 feet from the crossing when he applied the emergency brake. When the collision oc-curred, two or three bales of hay came through the window into the cab, and there were about fifteen bales of hay on the en-gine. There was glass and hay all over everything. He was familiar with this stretch of track. He did not blow the whistle for that particular crossing until the conductor told him the truck was com-ing. He hadn't "got quite to the proper place to blow for the crossing." He had

just gotten through blowing for another crossing. He estimated that he was 200 to 250 feet, not over 300 feet, from the crossing when the conductor told him the truck was approaching. On his prior deposition he had estimated 600 feet, and, when reminded of that fact, he stated that he would estimate that he was somewhere between 300 and 600 feet "because I applied my brakes before I got to the crossing." He blew the whistle after the conductor told him the truck was approaching. Then the conductor said that it looked like it was not going to stop and he applied the emergency brake. Not all crossings have whistle boards, but he blows for all crossings and curves. On his deposition he stated that it would take twenty pole lengths to stop the train (about 3500 feet), but at the trial he stated he meant twenty car lengths (about 1000 feet): The engines and twenty-four cars passed the crossing before the train stopped indicating some 1500 feet stopping distance from the place of applying the emergency brake.

Appellee testified that he "figured" the only thing that kept him from seeing the train was the Johnson grass. He couldn't tell exactly how tall it was, but it was from five to six feet and "sometime" taller. He didn't know exactly how tall Zaragoza was, but he was "five feet six, seven, eight or nine * * * somewhere in there." He might be six feet tall. The front of his truck was about 25 to 30 feet from the nearest rail when he stopped. He didn't know how far his eye level was from the ground when he was sitting in the truck. He couldn't see the train because of the Johnson grass, weeds and brush until he approached the crossing when it was too late to do anything. He was looking at the train before Zaragoza said anything. He didn't ask Zaragoza to keep a look-out because he was driving and keeping a look-out was his job. At that crossing it was impossible to see a train approaching from the east until the truck was actually on the track. "The whistle never did blow. I could have heard it if it had blown." Henry Zaragoza didn't block his view.

John D. Quinn lived near the Allen farm. He owned a farm and hired appellee to haul his hay. He had driven on the road in question many times. He was familiar with the crossing and was there the same day after the accident. To the east from the crossing the right-of-way was pretty brushy and a good number of trees had grown up between the fence line and the tracks. There was Johnson grass, and vines were growing in the trees. He had been there within two or three days before the accident and the right-of-way was in the same condition. His view was blocked so he stopped and got out of his vehicle so he could walk up on the track. He couldn't see down the track until he did.

Warren Byrd, an employee of Dr. Walton, was driving a tractor in a field some 250 to 300 yards from the crossing in question. He did not hear a whistle or bell, nor did he hear the collision. He had heard the whistle blow before and it is louder than the tractor. He was near enough to have heard it if it had blown. He was familiar with the crossing and it was bad. He mowed the right-of-way near the crossing before they finished cutting hay, but he did not remember whether it was before or after the collision. He had mowed it once before, he thought the year before. " * * * every once in a while the thing would grow up so tall you couldn't hardly see and that would be whenever we would cut it." * * * "I know sometimes it would get so tall that we couldn't see— I mean crossing it—too safely—and we would cut it."

James H. Banks, employed in the engineering department of appellant, made a survey of the crossing on the ground and prepared a plat (D's No. 9) on a scale of 40 feet to one inch at the request of Mr. Stevens. It shows that the distance from the center line of the track to the fence row is fifty and one-half feet. The right-

of-way is about one hundred feet wide. He thought he made the survey on February 13, 1967.

C. S. Banks, a photographer, made certain photographs at the request of Mr. Stevens. He testified that the pictures were made on September 30, 1966. He wrote down notes showing the locations from which the pictures were made. Mr. Stevens typed up the notes and attached them to the pictures. He did not strike out October 30 and insert September 30 in the notes attached to the picture introduced as D's No. 4A. The pictures accurately reflected the areas shown. He saw no evidence to indicate that the grass on the right-of-way near the crossing had been cut recently.

W. A. Stevens testified that the pictures were taken under his supervision and that they were taken on September 30, 1966. He has been an investigator or claim agent for the Santa Fe railroad since 1960, and his job involves the investigation of collisions and other accidents that involve railroads. He went to the scene immediately after he heard of the accident and arrived there at least as early as five o'clock of the same day. The truck was still at the scene and was covered with hay. He did not take any pictures at that time because he did not have a camera. He normally takes such pictures. There was heavy vegetation along the fence line including trees. The vegetation between the fence line and the track was not heavy. Some weeds were there, and there was no evidence of recent mowing. He returned to the scene with Mr. Banks on September 30, 1966, to take pictures, but he typed the notes in October. In connection with his investigations he takes statements from witnesses. He took a statement from the other man working with Byrd on Dr. Walton's farm; this man, Menyo Menyose, told him that he didn't hear the train whistle blow.

Special Issue No. 1, submitted by the trial court, reads:

"Do you find from a preponderance of the evidence that the railroad company failed to keep the weeds, Johnson grass, bushes and/or trees cut down inside its right-of-way?"

The jury answered this issue "Yes," and, in answer to subsequent issues found this failure to be negligence and a proximate cause of the collision.

Special Issue No. 4 reads:

"Do you find from a preponderance of the evidence that the operator of the train failed to blow its whistle or give warning of the approaching train as would have been given by an ordinary prudent person acting under the same or similar circumstances?"

The jury answered this issue "Yes" and found that the failure was the proximate cause of the collision.

Special Issue No. 9 reads:

"Do you find from a preponderance of the evidence that the crossing at which the collision occurred was an extra-hazardous public crossing?

"You are instructed that an extra-hazardous crossing is an unusually dangerous one.

"You are instructed that a public crossing is one that can be used by the public, and it may be public even though located on private land."

This issue was also answered "Yes" by the jury.

Issues inquiring of the conduct of appellant that would constitute contributory negligence were answered favorably to appellee.

Appellee contends that appellant's objections to the charge of the court should not be considered by reason of appellant's

failure to comply with Rule 272, Texas Rules of Civil Procedure, reading: " * *. The requirement that the objections to the court's charge shall be in writing will be sufficiently complied with if such objections are dictated to the court reporter in the presence of and with the consent of the court and opposing counsel, * * *." Appellee contends that he did not consent to this procedure. The transcript contains the transcribed objections and attached thereto is an order of the court certifying over his signature that the objections were dictated to the court reporter in compliance with Rule 272 in the presence and with the consent of opposing counsel and the court. In addition the statement of facts reflects that appellee's attorney agreed that six "stock" objections would be considered as made by appellant without the necessity of dictating them each time. The "stock" objections were then dictated. Appellee's position is untenable in view of the certificate of the trial court.

Appellee also contends that the objections should not be considered by reason of Rule 274, T.R.C.P., in that appellant did not point out distinctly the matter to which he objects and the grounds of his objections. Appellant objected to Special Issue No. 1 on the ground that "the issue is duplicitous and multifarious in that it inquires about the failure to keep four different species of vegetation cut; that is (a) weeds, (b) Johnson grass, (c) bushes, and/or (d) trees; and the jury might give an affirmative answer because they believe that there was a failure to cut either one of the four."

His objection also pointed out that the issue should be limited to vegetation growth which was close enough to the crossing to obstruct the plaintiff's view of an approaching train.

These objections were specific and were not "stock" objections. The evidence reflects that some trees were on the fence line, and some were inside the fence line, but near the fence and that brush extended four feet inside the fence line. It is uncontroverted that no one mowed the grass, weeds, bushes, or trees more than about 300 yards from the crossing within the fences. There is no testimony that anyone at any time trimmed or cut trees too large to be moved.

While it is clear from the answers made by the jury to other issues that the jury accepted the testimony that the Johnson grass and weeds extended to a point as near as fifteen feet from the track and prevented the driver from seeing the train at least up to that point, we must view the charge as of the time it was prepared. State v. Schlick, 142 Tex. 410, 179 S.W.2d 246 (1944); Thurman v. Chandler, 125 Tex. 34, 81 S.W.2d 489 (1935); Gillette Motor Transp. Co. v. Whitfield, 197 S.W.2d 157 (Ft. Worth Civil App.1946, aff'd 145 Tex. 571, 200 S.W.2d 624); and Pappas v. Wright, 171 S.W.2d 536 (San Antonio Tex. Civ.App.1943).

An enlightening discussion on the problems presented in determining whether a special issue is multifarious is found in Hodges, Special Issue Submission in Texas, Sec. 41, C, pp. 113 et seq. Mr. Hodges says:

"A special issue is multifarious or duplicitous if it inquires about several different facts, when each of such facts should be inquired about in a separate special issue. An issue is subject to this objection whether it is general, including the factual items only by implication or in the definition of the general term used in the issue, or whether, on the other hand, the separate factual items are expressly set forth in the issue itself. This is also true whether the issue requires a finding on the several factual items conjunctively and cumulatively, or whether it permits a finding on any one of the several disjunctively and alternatively.

\* \* \* \* \* \*

"A case has suggested as the test that the submission is erroneous if the issue

combines two distinct questions of fact, one of which might be answered in the affirmative and the other in the negative, and is accompanied by an instruction to answer the whole issue 'yes' or 'no.' * * * The suggested test is not valid in all cases. * * *

"The suggested test is properly applicable when each of the two distinct facts included in the issue presents a cause of action and the plaintiff is entitled to recover on both causes of action cumulatively as well as on either alternatively. But it cannot properly be applied in situations in which the two facts are elements of a single cause of action or of alternative and mutually exclusive theories of recovery. In such situations an issue which includes two distinct questions whether independently answerable or not, is multifarious if each constitutes a large enough segment of the facts of the case to be an ultimate or controlling issue. But if the two questions are each evidentiary, so that together, or alternatively, they make up a single ultimate or controlling issue, the single issue combining them is not multifarious."

Questions arising from the manner of submitting this issue are also considered in McDonald, Texas Civil Practice, Vol. 3, § 12.19, pp. 1110 et seq. At page 1112 this text reads:

"The second error is that of submitting a special issue which is broader in language than is justified by the evidence and the pleading. Such an inquiry may be duplicitous because it includes two or more controlling issues; may be so vague that either (a) it forces the jurors to speculate as to its scope, or (b) it leaves the court and the parties without guidance as to the grounds upon which the jurors based their findings; may in effect amount to a general charge; or may fail to confine the jury's deliberations within the evidence and the pleading. * * *."

In view of the evidence that trees were within the right-of-way a considerable dis-

tance east of the crossing, the issue in question is too general in that the inquiry is not confined to an area sufficiently near the crossing to obstruct the appellee's view of an approaching train. It thereby permits the jury to speculate on its scope and leaves the court and the parties without guidance as to the grounds upon which the jurors based their findings. The issue also fails to confine the jurors' deliberations within the evidence. The parties and the court are unable to determine whether the jury found that the Johnson grass, weeds, bushes, and trees obstructed the view of appellee, or whether it was the trees alone. Appellant's objections were well taken.

■ Appellant objected to Special Issue No. 4, in addition to the "stock" issues, as follows:

"7) Such issue is duplicitous and multifarious in that it inquires in a single question about failure to (a) blow the whistle or (b) give such other warning as would have been given by an ordinary prudent person acting under the same or similar circumstances, and such issue should be split, inquiring first whether or not there was a failure to whistle, and second whether there was a failure to give other warning, and third whether such failure in either instance was negligence; and because these three inquiries are made in a single issue, the jury will have the impression that the Court is of the opinion that there is no dispute as to two of the matters inquired about when the evidence in fact is quite contradictory about the blowing of the whistle, the giving of other warning, and about whether or not any failure to do either was negligence."

Under the issue as worded there is no inquiry as to negligence if the jury should find a failure to blow the whistle. That portion of the issue inquiring about the conduct of an ordinary prudent person is confined to the part of the issue beginning, "or give warning." The issue is duplicitous. The only controverted issues were whether

the engineer blew his whistle for the crossing in question, or for the previous crossing, and whether he caused the bell to ring. The jury might have speculated that an ordinary prudent person under the same or similar circumstances would have provided a flagman or some other method of warning those using the road of the approach of the train, it being uncontroverted no such warnings were given. There is a question as to whether the whistle was sounded, if at all, too soon or too late. The jury was free to speculate on the scope of the issue and the court, as well as the parties, are unable to determine the grounds on which the finding was based.

Appellant made these objections to Special Issue No. 9, in addition to the "stock" objections:

"7) Such issue is not a material issue and any finding that the jury makes thereon cannot form the basis for judgment, because no inquiry is made in regard to knowledge on the part of the defendant of the character of the crossing, and no inquiry is made in regard to whether or not in the exercise of ordinary care some extraordinary precaution would be required at the crossing such as flashing light signals, bells, flagman, barriers, etc.

"8) Such issue is multifarious and duplicitous and makes inquiry of two separate disputed matters of fact, first whether or not the crossing was extra hazardous, and second whether or not the crossing was a public one.

"9) Defendant objects to the issue and instruction accompanying same because the Court does not give the jury a proper definition of an 'extra hazardous crossing', and the Court should instruct the jury that 'an extra hazardous crossing' is one which cannot be used with safety by an ordinarily reasonable and prudent person unless some extraordinary precautions in the way of warning signals of approaching trains is installed.

"10) Defendant objects to the issue and instruction accompanying it in regard to public crossing, because it wholly fails to instruct the jury that a public crossing is one that the public has a right to use, acquired either by long use or a formal dedication as a public way, and the jury under the instruction given could determine that the crossing was a public one simply because it could be used by the public, and this does not determine the nature of the crossing, whether public or private, as all the crossings can be used by the public."

It would seem that the court submitted Special Issue No. 9 as a basis for recovery under the theory that if the crossing was extra hazardous appellant was under a duty to take special precautions to protect the traveling public, and that since it was undisputed that there were no warning signs, flashing lights, bells, etc., negligence and proximate cause would be established as a matter of law.

■ Appellant's requested definition of the term "extra hazardous crossing" is not substantially correct by reason of the inclusion of the phrase, "unless some extraordinary precautions in the way of warning signals of approaching trains is installed." Phillips v. Texas & Pacific Ry. Co., 223 S.W.2d 258 (El Paso Tex.Civ.App. 1949, ref., n.r.e.). He did object to the definition as not being correct, and this was sufficient to preserve the error since it pointed out the specific defect in the definition. Yellow Cab and Baggage Co. v. Green, 154 Tex. 330, 277 S.W.2d 92 (1955). A proper definition is quoted in Phillips v. Texas & Pacific Ry. Co., supra. The crossing, to be extra hazardous, must be one so particularly dangerous "that an ordinarily prudent person cannot use the same with safety." Missouri, K. & T. Ry. Co. of Texas v. Long, 299 S.W. 854 (Tex.Com. App.1927).

■ The appellant could not be held responsible on account of any unusual danger at said crossing unless it knew of such

conditions or by the exercise of ordinary care should have so known. Missouri, K. & T. Ry. Co. v. Long, supra; Karr v. Panhandle & Santa Fe Ry. Co., 153 Tex. 25, 262 S.W.2d 925 (1953). Here the crossing was on an infrequently used rural road primarily serving as an alternate route to one farm house and in farming operations. The condition creating the danger was temporary and not created by any act or omission of the appellant. There is little or no evidence of the duration of this condition. An issue inquiring whether appellant had knowledge or notice of the condition was necessary. Tisdale v. Panhandle & S. F. Ry. Co., 228 S.W. 133, 16 A.L.R. 1264 (Tex. Com.App.1921); Missouri, K. & T. R. Co. of Texas v. Long, 23 S.W.2d 401 (Austin, Tex.Civ.App.1929, writ ref.).

■ Appellant's objection to the definition of "public crossing" was good and should have been sustained by the trial court. Before a road is a public road, it must be used by the public generally as a matter of right. Missouri Pac. R. Co. v. Lee, 70 Tex. 496, 7 S.W. 857 (1888); O'Sullivan v. Brown, 171 F.2d 199 (5th Cir. 1948); Bradford v. Moseley, 223 S.W. 171 (Tex.Com.App.1920); Houston E. & W. T. Ry. Co. v. Sherman, 10 S.W.2d 243 (Beaumont Tex.Civ.App.1928) aff'd (42 S.W.2d 241, Tex.Com.App.1931); Phoenix Refining Co. v. Walker, 108 S.W.2d 323 (Beaumont Tex.Civ.App.1937, writ dism.).

Appellant objected to Special Issue No. 30 for the reason that it submitted an improper measure of damages in that it permitted recovery for repairs without evidence that same were reasonable in cost. The only testimony bearing on this question is found in the series of questions and answers following:

"Q. All right. Now after repairs—do you know how much repairs you spent on this truck?

"A. I guess I would have to figure it up.

"Q. Well, give us your best reasonable estimate?

"A. I figure maybe around eighteen or seventeen or maybe close to two thousand dollars it took quite a bit to get it back together."

Appellee purchased the necessary materials and did his own repair work. Apparently he was not certain how much he spent on repairs. There is no evidence as to the reasonableness of the cost of the repairs.

■ Appellant contends that the trial court erred in overruling his motion for judgment non obstante veredicto for the reason that all of the evidence established that the approaching train was plainly visible and was in hazardous proximity to the crossing as appellee approached it in his truck, and that he proceeded onto the railroad track when he could not do so safely. Other points presented the question whether the jury findings with regard to these matters were so contrary to the great weight and preponderance of the evidence as to be clearly wrong.

Appellant recognizes that appellee and Zaragoza testified that they could not see the train because of the high weeds and Johnson grass. It is contended that this testimony has no weight because the undisputed physical facts demonstrate that the train could have been seen had either of them looked. This position is supported by Zaragoza's testimony that he was five feet ten or eleven inches in height, and that by looking at one of the exhibits, a picture of Zaragoza standing by the truck, it can be determined that the eye level of the driver would be about the same height as Zaragoza, together with Zaragoza's testimony to the same effect; Acosta's testimony that the vegetation was five feet six, ten inches or six feet, more at places; and the known fact that locomotives are large objects. There is no testimony as to Acosta's height or eye level when seated in the car. Estimates of such matters drawn from photographs are unreliable. It is a matter of common knowledge that not all people are the same height when seated.

The testimony of Quinn supports that of Acosta and Zaragoza. The points are overruled.

■ Appellant contends that the trial court erred in refusing to permit its counsel to impeach the testimony of appellee by referring to his prior testimony, in his suit with his insurer for property damage, that the truck was a total loss. Appellant included in his questions concerning appellee's previous testimony reference to the fact that there was a suit in which appellee recovered a judgment for total loss. The trial court properly refused to permit the jury to hear this information. Total loss under an insurance policy may not mean that the vehicle could not be repaired economically by the owner. The questioning could have avoided the matter of the law suit and the amount of recovery.

Appellant also contends that the trial court erred in refusing to declare a mistrial by reason of appellee's attorney referring to insurance in his argument. During the course of his argument counsel for appellee stated:

"Mr. Stevens testified that he was out there the day of the accident. Of course he is an adjuster for the railroad company. —They try to get right out there while the blood is still on the ground and people are laying down dying—to protect their insured or company."

The trial court overruled the motion for a mistrial and refused to specifically instruct the jury "not to consider insurance in anyway in this case" as requested by appellant's counsel. It was the position of the trial court that such an instruction had already been given the jury, and that any further mention of the matter would unduly emphasize insurance. He did instruct the jury as follows:

"Ladies and Gentlemen of the jury, I have heretofore read you the court's charge and I want again to reiterate that when you consider this case, that you go only by the court's charge in governing your delib-

eration on this case and not any statement that any attorney might make."

Appellee's attorney then continued his argument: "As I was saying we are familiar with the adjusters, their kits, pencils, their little note book, their typewriters, their cameras, and their job is to go out to these scenes of accidents to investigate right then and there to take statements and to make pictures. * * *"

■ It is well settled that it is reversible error to disclose to the jury that the defendant has liability insurance. While not every casual or inadvertent reference to insurance in the course of a trial will necessitate a mistrial, where the plaintiff by artful questions attempts to convey to the jury the information that the defendant probably is protected by indemnity insurance, a mistrial should be declared. Jackson v. Edmondson, 136 Tex. 405, 151 S.W.2d 794 (1941); Rice v. Schiller, 241 S.W.2d 330 (Dallas, Tex.Civ.App. 1951, aff'd Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607); William Cameron Co. v. Downing, 147 S.W.2d 963 (El Paso Tex.Civ.App.1941).

The authorities cited above condemn the use of the word "adjuster" in referring to a witness in the trial of a damage suit as tending to inject insurance into the case. In William Cameron Co. v. Downing, supra, the court said: " * * *. An adjuster in the insurance business is an agent of the company charged with the investigation and adjustment of claims against the company. This, we think, is a general acceptation of the term among the public at large. The intervention of an adjuster suggests an insurance company. * * *."

■ It was established by evidence that Mr. Stevens was a claims agent or investigator employed by the railroad. It is also clear that after appellant objected to appellee's designation of Mr. Stevens as an "adjuster" on the ground that the use of that term tended to create the impression that the defendant was protected by in-

surance, appellee deliberately continued to use the term. The evidence on vital issues in this case was closely contested. Under the facts in this case the trial court erred in refusing to declare a mistrial.

■ Appellant objected to the inclusion as one of the elements of damage suffered by appellee, "Such loss of the reasonable value, if any, of his services to his business that plaintiff sustained from the date of the collision to the date of trial." Appellee was entitled to have included in the issue compensation for his loss of time, i. e., his loss of earnings, from the date of his injuries to the date of trial, if there is evidence of such loss. Appellee testified that in his opinion the value of his services to his business was about ONE HUNDRED AND NO/100 ($100.00) DOLLARS a week. He testified that he grossed about NINETEEN THOUSAND AND NO/100 ($19,000.00) DOLLARS from his business in 1966 and about the same amount in 1967. There is no testimony that he hired someone to do the work he had previously done, or that his net profits had been reduced. The objection made by appellant should have been sustained. The instruction must be phrased in terms of lost time or lost earnings. Sinclair Refining Co. v. Tompkins, 117 F.2d 596 (5th Cir. 1941); Combined American Ins. Co. v. Morgan, 214 S.W.2d 145 (El Paso Tex.Civ.App.1948). See also Dallas Railway and Terminal Co. v. Guthrie, 146 Tex. 585, 210 S.W.2d 550 (1948); International & G. N. R. Co. v. Simcock, 81 Tex. 503, 17 S.W. 47 (1891); 22 Am.Jur.2d, Damages, § 89 et seq.

Other points of error have been presented and considered by the court. In view of our disposition of this case, we consider it unnecessary to write on each of these points since either the points do not present reversible error, have become immaterial, or are not likely to reoccur at another trial.

The judgment is reversed and ordered remanded.