The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, et al.,
Appellants,

v.

Annie Nell HOLLOWAY et al., Appellees.

No. 7296.

Court of Civil Appeals of Texas,
Beaumont.

Feb. 24, 1972.

Rehearing Denied April 13, 1972.

 

O'Brien & Richards, Beaumont, for appellant.

Seale & Stover, Jasper, for appellee.

KEITH, Justice.

The railroad and its locomotive engineer appeal from an adverse judgment based upon a jury verdict. Plaintiff's decedent was operating a pulpwood truck south upon State Highway 87 near Bleakwood in Newton County when his vehicle was in a collision with an eastbound Santa Fe train. The truck struck the left front footsteps on the lead engine, derailing both diesel units, killing Holloway instantly. In this suit brought by his widow and children, the jury found that the crossing was extrahazardous and that the railroad failed to take extraordinary precautions to warn travelers of approaching trains. However, the jury convicted Holloway of numerous acts of contributory negligence proximately causing the accident, including the violation of Art. 6701d, § 86, Vernon's Ann. Civ.St. Liability of the defendants was based solely upon adverse findings upon the issues of discovered peril. We will refer to the parties as they appeared in the trial court.

Defendants attack the finding of the discovered peril issues with points raising the question of no evidence, insufficient evidence, and that the findings are against the great weight and preponderance of the evidence. As to the "no evidence" points, we will review the evidence and the inferences therefrom in the light most favorable to plaintiffs and in support of the jury's answers. Gentry v. Southern Pacific Company, 457 S.W.2d 889, 890 (Tex.Sup.1970). In considering the latter two points, we consider the record as a whole.

The railroad locomotive was equipped with a speed tape which indicated that the train was moving at the rate of 20.5 miles per hour which was compatible with the estimates of speed given by each of the trainmen. The speed of the truck is not so

firmly fixed in the record. An outside witness employed by the telephone company placed the truck's speed at between forty and fifty miles per hour, while the members of the train crew testified that the speed was between forty and fifty-five miles per hour.

The train consisted of two diesel electric locomotives in tandem, each nearly fifty-six feet in length, pulling twenty-six rail cars of which five were loaded. The position of the engineer in the cab, being on the right side thereof, made it impossible for him to see the approaching truck. The train brakeman was riding upon the fireman's box on the left side of the lead locomotive and the conductor was seated to his rear upon the same side. Both testified that they saw the approaching truck before the collision and it is their testimony upon which both parties rely.

We first consider the testimony from the train crew which the plaintiffs contend supports the jury findings on discovered peril. This testimony was from pre-trial deposition evidence read into the record by plaintiffs' counsel. Train Conductor *Johnson* said that he was seated behind Brakeman Rhymes upon the left side of the locomotive cab when he saw the truck approaching the crossing from the north. He said that he first saw it when it was "approximately 200 or 300 feet" back from or north of the crossing. The front of the locomotive was then "about 150 feet, about three car lengths" to the west of the crossing. Holloway's perilous position and impossibility of extrication therefrom came from Johnson in this manner:

"Question: From the first time you saw him, it appeared to you that he was not going to stop?

"Answer: That's right.

"Question: And so if he didn't stop, you knew this was going to be a wreck?

"Answer: That's right."

Brakeman *Rhymes* testified that Conductor Johnson did not give any warning of the approach of the truck and said only, "All clear on my side." Rhymes estimated that the train, at its speed of twenty miles per hour, could be stopped in three car lengths. Engineer *Wallace* could not see the approaching truck and made no effort to stop his train until he was fifty to seventy-five feet from the crossing when he applied his emergency brakes. He "big holed" the engine (applied the emergency brakes) because Rhymes "come up on his feet and said, 'He is not going to stop.' And I put it in emergency then." Johnson "didn't say anything." The engineer said that after setting his brakes his train "was slowing down" and that the brakes were taking effect "some" before the accident. The engineer was of the opinion that the train, going at a speed of twenty miles per hour, could be stopped in "roughly" 175 feet.

Plaintiffs tendered a retired locomotive engineer, who had formerly worked for the Southern Pacific Railroad, as an expert witness. He said that he was familiar with the type of equipment involved in the wreck and had operated similar equipment. In his opinion, the train could have been stopped within two engine lengths at a speed of twenty-one miles per hour—about 112 feet. He was permitted to answer a hypothetical question and said that *if* Conductor Johnson had notified the engineer of the approaching truck when the engine was 150 feet from the crossing, and *if* Engineer Wallace had immediately applied the brakes, the collision could have been avoided.

In reviewing the no evidence points, the rule governing our action is that set out in Gentry v. Southern Pacific, supra:

"The quantum of proof required to entitle plaintiff to have the discovered peril issues submitted is evidence of such facts and circumstances, together with all reasonable inferences therefrom as would constitute some evidence of probative force of their existence." (457 S. W.2d at p. 892)

We have set out the testimony which plaintiffs urge upon us as supporting the findings on discovered peril; and, having done so, we now turn to the remarks of Chief Justice Calvert in Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752, 755 (Tex.Sup.1970): "In this case, as often happens, the question of whether there is more than a scintilla of evidence to support the finding of a vital fact is close."

However, considering only such evidence and indulging all reasonable inferences therefrom, we are of the opinion that it does rise to the level of "some evidence of probative force" tending to establish the vital facts upon which plaintiffs rely for recovery. Defendants' point three is overruled. See Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error," 38 Texas Law Rev. 361 (1960).

■ When we consider the record as a whole, however, we come to an opposite conclusion. In passing upon defendants' points four, five and six, we consider the evidence of probative force tending to prove the existence of a vital fact and the evidence tending to disprove its existence. Calvert, supra (38 Texas Law Rev. at p. 367).

Here, as in most cases involving the doctrine of discovered peril, the vital issue narrows down to the element of time; and, as is so often the case, the critical period is hedged with fuzzy approximations of speed, distance, reaction time, braking time, etc. Nevertheless, we now add to the synopsis of the record so as to present the complete picture of the circumstances leading up to this tragedy.

Brakeman *Rhymes* testified that the train was "pretty close to the crossing" when he first said, "Here comes one." He said: "I have to say it couldn't have been more than a hundred feet back . . . It couldn't have been no more than a hundred feet back, because that would give me that view from them little trees to see this truck, and I would say it was about a hun-

dred feet . . . you had to get close to this crossing to see it." He estimated the engine to be about two car lengths back from the crossing when he first saw the truck.

Conductor *Johnson* further testified that when he first saw the truck (at a time when it was about 300 feet from the crossing and the front of the engine 150 feet to the west thereof) he "talked to the engineer . . . and told him it didn't look like he was going to stop, and the other fellow [Brakeman Rhymes] in front of me said he is not going to stop, so he big holed it." It was "just a matter of a second or two" for the sequence of events to occur.

Engineer *Wallace* said that while the conductor "didn't say anything, . . . He come out of his seat" about the same time Rhymes did. Wallace testified that Johnson "could have been hollering too, I don't know. I heard the head brakeman." He said that the truck "climbed up over the front end [of the engine] and fell down over the drawbar." It wound up on the right side of the engine, about a hundred feet east of the crossing. Wallace said that he "came very close to being hurt in that accident . . . it threw me down in the floor" when the engine derailed.

Brakeman *Rhymes* said that the engine had to get close to the crossing for him to see the road because of some "little trees" obscuring his vision. Having told the engineer, "He ain't going to stop," Rhymes said that he did not "let the grass grow under my feet, and the moment I said that, I was moving." He broke open the door upon the engineer's side of the cab, vaulted a safety railing on the side of the engine, and jumped to the ground on the right side of the engine "no more than three feet from the crossing."

Santa Fe produced its expert upon the braking system of the train and he qualified from experience operating such equipment as well as formal studies. He was

given the weight of the two engines (249,000 pounds each) and of the train (a total of 1150 tons) and testified that at twenty miles per hour, it would take 510 feet to stop the train. He took into account, in addition, a reaction time on the part of the engineer of three-fourths of a second, during which time the train would have traveled twenty feet. He said that it then took 1.56 seconds for the "signal to operate through the air line from the head end to the rear end [of the train] and to establish the emergency application" of the brakes. The train would have moved more than sixty feet during this interval.

He also said that "[f]rom the time that this signal is transmitted until the brakes become fully effective, this takes a period of nine seconds." He concluded that the train would have traveled 352 feet "before he'd get any effective" deceleration.

Summarizing the evidence on the question, Engineer Wallace never saw the truck so that his only knowledge of its approach was when Brakeman Rhymes told him of the approaching truck at a time when the train was fifty to seventy feet away from the crossing. There is no evidence that Engineer Wallace failed to exercise ordinary care by the use of the means at his command after such realization of the perilous position of Holloway.

Brakeman Rhymes was not asked how far the train was from the crossing when he first saw the truck so that there is no evidence in the record to establish that Rhymes had sufficient time, after realization of the perilous position of Holloway, to use the means at his command to avoid the collision. The record is completely silent as to any braking mechanism on the left side of the locomotive.[1] Beyond question, the whistle was being blown and the engine bell was ringing as the locomotive approached the crossing. There was, con-

sequently, no evidence that Rhymes could have done anything to avoid the collision other than what he did do—holler at the engineer to apply the brakes in emergency. This he did and immediately jumped from the locomotive trying to avoid injury to his own person.

So the issue of discovered peril must rest solely and exclusively upon the testimony of Conductor Johnson that he saw the truck when it was 200–300 feet of the crossing and the engine was about 150 feet therefrom. The problem with this testimony is that there is no proof that he could have done anything other than holler. The only evidence as to his attempt to avoid the collision is his statement that he spoke to the engineer. We quote him directly at this point:

"Question: When you first saw the truck did you do anything at that time?

"Answer: Yes, I talked to the engineer and after I saw it, I talked to him and told him it didn't look like he was going to stop, and the other fellow in front of me said he was not going to stop and so he big holed it.

"Question: Emergency stop?

"Answer: Emergency stop. As quick as possible. So that's what happened.

"Question: As I understand it, you said something about like, 'It don't look like he's going to stop,' and the fellow in front of you said, 'He's not going to stop,' and the engineer big holed?

"Answer: Yes, sir."

The only person aboard the locomotive who could take any action—or had any means at his command to avoid the collision—was the engineer with his brake. He used the brake, according to the testimony in our record, as soon as he understood

I. Justice Greenhill in Texas & New Orleans Ry. Co. v. Hart, 163 Tex. 450, 356 S.W.2d 901, 907 (1962), said that "[t]he burden was upon plaintiffs to prove that there *was* an emergency brake on the fireman's side." (emphasis in original)

Brakeman Rhymes. Unless he heard the earlier remarks by Conductor Johnson, he was not aware of any perilous position of Holloway. "While a jury would be free to disbelieve the testimony of the fireman and the engineer, their testimony is not evidence that the opposite of what they said was true. Safeway Stores, Inc. v. White (Tex.Sup.1961), 162 Tex. 473, 348 S.W.2d 162." Texas & New Orleans Ry. Co. v. Hart, 163 Tex. 450, 356 S.W.2d 901, 907 (1962).

As was said in Martin v. Texas & N. O. R. Co., 236 S.W.2d 567, 568 (Tex.Civ.App., Galveston, 1951, error ref.), [quoted with approval in the *Hart Case*] :

"An interval of time had to elapse after realization until the fireman could give the signal. A greater interval of time had to elapse to enable the engineer to understand the signal, respond, and apply the brakes."

■ It will be remembered that in Turner v. Texas Co., 138 Tex. 380, 159 S. W.2d 112, 118 (1942), the court said that the actual discovery requirement meant discovery "by the person who inflicted the injury." And, we repeat, this interval of time, insofar as the engineer was concerned, did not start until he *knew* of the perilous position of Holloway—after Rhymes had hollered. This is so because the plaintiffs must establish not merely that the defendant ought to have known or discovered the peril, but that he actually discovered it. Texas & P. Ry. Co. v. Breadow, 90 Tex. 26, 36 S.W. 410, 412 (1896) ; Texas Electric Service Co. v. Kinkead, 84 S.W.2d 567, 569 (Tex.Civ.App., Fort Worth, 1935, error dism.). Unless it can be said that there was evidence that a person of ordinary prudence, under the same or similar circumstances, would have taken action earlier (applied the brakes in this instance), liability under the doctrine of discovered peril did not attach. Tumlinson v. San Antonio Brewing Ass'n, 170 S.W.2d 620, 622 (Tex.Civ.App., San Antonio, 1943, error ref. w. o. m.), an opinion by the late

Justice Norvell while upon the Court of Civil Appeals.

The problem of reviewing the evidence is further complicated by the manner in which Special Issue No. 9 was worded, asking the jury if "some" member of the crew discovered the perilous position of Holloway. We reserve comment upon this point at the moment.

■ From our review of the entire record, we are of the opinion that the jury's answers on the discovered peril issues are contrary to the great weight and preponderance of the evidence. As was said in Schuhmacher Co. v. Posey, 147 Tex. 392, 215 S.W.2d 880, 882 (1948), "The doctrine of discovered peril or last clear chance means certainly that the last clear chance must be a clear one. . . . It implies thought, appreciation, mental direction, and lapse of sufficient time to act effectually upon the impulse to save another from injury." The reason assigned by the courts is that for the humanitarian doctrine to be invoked, "the conduct of one who, after discovering and realizing the peril of another in imminent danger of being injured, fails to use ordinary care to avoid injuring such other person, is very nearly the equivalent of deliberate and intentional misconduct." Whited v. Powell, 155 Tex. 210, 285 S.W.2d 364, 366 (1956).

The time element in this case was extremely short—at most from three to five seconds. The train traveling upon fixed rails could not take any evasive action. In this extremely short interval, we must also bear in mind that the members of the train crew were also apprehensive of their own safety. It is common knowledge that inflammable gasoline in motor vehicles, diesel fuel in the locomotives, and derailment of the train can cause serious injury to persons in the immediate vicinity of such an accident.

Justice Greenhill in Texas & New Orleans Ry. Co. v. Hart, supra, reviewed many of the Texas cases upon the subject, particularly with reference to the time inter-

val involved, and held that the evidence did not raise the issue of discovered peril. Contrary to the situation prevailing here, he noted: "There is no question here of the safety of the train or its operators." (356 S.W.2d at p. 905, fn. 1).

Granted that liability under the humanitarian doctrine can be established by circumstantial evidence, it has been said, "theoretically at least, a stronger showing is necessary to establish to the satisfaction of the trier of facts that a person was actually discovered in a position of peril than to show that one had ample opportunity to discover the peril of the injured party." Texas & N. O. R. Co. v. Ozuna, 266 S.W. 2d 896, 899 (Tex.Civ.App., San Antonio, 1954, error ref. n. r. e.).

Having reviewed the evidence under the acceptable standards, we are of the opinion that Santa Fe's point five is meritorious and it is sustained. This action requires a reversal and remand of the cause. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ Our action reversing the judgment of the court below and ordering a new trial makes it necessary that we notice several other points brought forward by the defendants. Defendants contend that the court erred in overruling their motion to change the venue of the cause under the provisions of Rule 257(c). We note that the motion was not supported by the affidavit of either of the defendants, although the affidavits of three other persons were attached thereto. Under the rationale of City of Abilene v. Downs, 367 S.W.2d 153 (Tex.Sup.1963), the motion for such a change of venue may be filed at any time before proceeding to the trial of the cause. The question of the sufficiency vel non of defendants' motion and plaintiffs' delayed response thereto will not likely be encountered upon another trial. Defendants' points one and two are overruled.

■ Defendants bring forward several objections to the court's charge submitting

discovered peril. Basically, the charge followed the issues set out in 1 Texas Pattern Jury Charges, § 7.09 (1969), although suggested Issue No. 2 was divided into two issues, one submitting discovery and the other, extrication. Point seven complains of the omission of the word "actually" modifying the word "discovered" in Issue No. 9. We agree with defendants that there must be actual discovery for the doctrine to be applicable. Texas & New Orleans Ry. Co. v. Hart, supra (356 S.W.2d at p. 905). However, the point does not reflect error since it is admitted that there was actual discovery in this case. Defendants' real challenge is to the time element, not whether or not there was an actual discovery of Holloway's perilous position. Point seven is overruled.

■ Special Issue No. 12 inquired if the train crew, after discovery and realization, failed to exercise ordinary care "in the use of the means available to them to avoid the occurrence in question." Defendants contend that this was a "global submission" and "fails to specify which of the several means available to the crew was not used with ordinary care." We disagree and overrule point eight. The *only* means available were those mentioned by Chief Justice Calvert in Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W. 2d 561, 563 (1952):

"When the fireman discovered the perilous position of the plaintiff it was his duty to warn the engineer and to call for the application of the emergency brakes. It then became the duty of the engineer to apply the emergency brakes."

In our case, the question is not whether other means were available, but whether or not the means which were available were used. The point does not reflect error and is overruled.

Under our record, a more serious question is presented when we come to consider defendants' ninth point which complains, in substance, that "some member of the train

crew" discovered Holloway's perilous position. The next issue inquired if "said member" of the train crew realized that Holloway would not extricate himself from the position of peril. The thrust of the argument is that with three members of the crew in the cab, each charged with duties under the doctrine of the *Ford Case,* supra, "[n]either the parties to this action, nor this Court can determine" which crew member was derelict in the duty imposed upon him. Primary reliance is placed upon Atchison, Topeka & Santa Fe Railway Co. v. Acosta, 435 S.W.2d 539, 546 (Tex.Civ. App., Houston (1st Dist.), 1968, error ref. n. r. e.).

■ From our evaluation of the evidence in the record, it appears that the testimony of Brakeman Rhymes and Engineer Wallace, ruled out a finding of discovered peril. True, they were interested witnesses and it was for the jury to determine their credibility. But, their "testimony in that respect is not evidence that the opposite of what he [they] said is true." Safeway Stores, Inc. v. White, 162 Tex. 473, 348 S. W.2d 162, 165 (1961). On the other hand, our review of the evidence has convinced us that the testimony of Conductor Johnson along with the negative testimony of the engineer, does raise the issue of discovered peril.

■ Yet, we have no finding by the jury as to which of the three men were negligent. Under the peculiar circumstances in this record, we sustain point nine. *Acosta Case,* supra. See in this connection the comments of Associate Justice Stephenson in Texas and New Orleans Railway Company v. Hart, 350 S.W.2d 227, 230 (Tex.Civ.App., Beaumont, 1961), reversed on other grounds, 163 Tex. 450, 356 S.W.2d 901 (1962).

Upon a prior trial of this cause, plaintiffs had offered evidence from an economic expert as to the value of money in connection with the damage issues. This witness, a resident of Arkansas, was cross-examined by defendants at the time.

Upon the second trial, this witness was, according to the testimony of plaintiffs' counsel, out of the country. Over defendants' objections, the court permitted the introduction of the testimony given upon the first trial.

■■ The witness being beyond the jurisdiction of the court, it was not error for the trial court to receive this evidence. Lone Star Gas Co. v. State, 137 Tex. 279, 153 S.W.2d 681, 697 (1941). Defendants claim, however, that we should take judicial knowledge of the fact that interest rates varied greatly during the period intervening between the two trials and that it was, consequently, deprived of its right to cross-examine the witness upon the rates prevailing at the time of trial. Reliance is placed upon Houston Fire & Casualty Insurance Co. v. Brittain, 402 S.W.2d 509, 511 (Tex.Sup.1966). While there is some similarity between the two cases, the language of the Supreme Court relied upon by defendants was that used by the court in assessing the harmful character of the evidence received. Having theretofore found reversible error in the receipt of the evidence in *Brittain,* the court went further and found that the receipt of such evidence constituted reversible error. We do not find error; hence, the language relied upon is inapposite. Point ten is overruled.

Reversed and remanded.

## Dissenting Opinion

STEPHENSON, Justice.

I respectfully dissent. I do not find the answers of the jury to the discovered peril issues to be clearly wrong or manifestly unjust. I would affirm the judgment of the trial court.

There is evidence in this record supporting findings that the member of this train crew discovered the perilous position of the driver of the truck, recognized the danger in time to avoid a collision, and

negligently failed to use the means at hand to avoid it. As they are permitted to do, this jury could accept certain portions of the testimony of a witness and reject other portions in arriving at their answers. The conductor, Johnson, testified he first saw the truck and realized there was going to be a wreck when the locomotive was about one hundred fifty feet from the crossing. When he first saw the truck, he told the engineer that it didn't look like the truck was going to stop and the brakeman, Rhymes, said he was not going to stop. According to all of the evidence, the train was traveling about twenty miles per hour which means it was moving about thirty feet per second. That means if the train continued at the same speed, it would arrive at the crossing in five seconds. However, both Johnson and the engineer, Wallace, testified the brakes began to take effect when applied, so there was more than five seconds of time before the train reached the crossing. Murray, the retired Southern Pacific engineer, testified this train could be stopped in 112 feet while Rhymes said it could be stopped in 150 feet. It is apparent that the opinion of Murray considered reaction time because he had just been interrogated about reaction time before the question as to the distance required to bring the train to a stop. Further, later in his testimony, Murray expressed the direct opinion that taking into consideration the reaction time of both the conductor and engineer, the collision could have been avoided if the engineer had immediately turned the valve for an emergency stop. All of this testimony as to time and distances is circumstantial evidence that Johnson or Rhymes did not, in the exercise of ordinary care, warn Wallace in time or that the brakes were not applied within the time that they should have been in the exercise of ordinary care.

This is a case of split-second timing, but this is generally true in a discovered peril situation. According to the evidence, the truck was traveling from forty to fifty-five miles per hour. Johnson stated the truck was from 200 to 300 feet from the crossing when he first saw it. Other evidence is to the effect that the truck did not slow down. At forty miles per hour, the truck would travel about sixty feet per second which means it would cover 300 feet in five seconds. Even though Wallace testified the truck struck the engine at the front steps, he stated the truck got on the other side of the track by coming up over the front end of the engine. A more believable account given by Hanks, a disinterested witness called by defendant, is that the train hit the right side of the truck about the door, toward the back of the cab. He admitted that in a fraction of a second or so, if the truck had gotten there sooner or the train later, the truck would have made it. Using the mathematical formula based upon the premise that the truck was traveling at the lowest estimated speed given, forty miles per hour, the truck would have cleared the track in one-third of one second.

Even though there is evidence to the contrary, coming primarily from an expert witness called by defendant who stated in his opinion the train would take 510 feet to stop, the credibility of the witnesses was for the jury and they chose to believe otherwise. The quantum of proof required of the plaintiff in this case on the elements of discovered peril in order to be entitled to have the jury pass on them was such facts and circumstances as, taken together with all reasonable inferences therefrom, constitute some evidence of probative force as to their existence. Texas & New Orleans Ry. Co. v. Hart, 163 Tex. 450, 356 S.W.2d 901 (1962). In that case, the Supreme Court held there was no evidence to support the submission of discovered peril issues. However both the times and the distances were shorter in the *Hart Case* and there was no proof in the *Hart Case* as to the distance required for the train to be stopped.

The majority opinion also found reversible error in the trial court's method of submitting discovered peril. Again, I respectfully dissent.

Since writing the opinion referred to by the majority in Texas & New Orleans Ry. Co. v. Hart, supra, I have not changed my opinion as to the vice in the method of submitting discovered peril which has the approval of our courts. It is not only impossible to know what means a member of a train crew had at hand to avoid a collision, but also which member of the crew was negligent in not using such means. The Supreme Court of this state has never made any requirement that the discovered peril issues be more specific and has given its stamp of approval to a general submission. See Ford v. Panhandle & Santa Fe Ry. Co., supra; Houston & T. C. R. Co. v. Finn, 101 Tex. 511, 109 S.W. 918 (1908).

In my opinion, reliance upon Atchison, Topeka & Santa Fe Railway Co. v. Acosta, supra, by defendant is misplaced. *Acosta* was not a discovered peril case and it is a well documented fact that the courts apply different sets of rules to issues submitted to the juries covering primary negligence and contributory negligence and issues covering discovered peril.

## ON MOTION FOR REHEARING

### DIES, Chief Justice.

While I concurred in remanding this case for a new trial, it was for different reasons than those given in the majority opinion. In order to permit the Supreme Court to review this case if it so desires, these reasons must now be given.

In order to explain my rationale it will be necessary to quote some of the evidence. The conductor, Johnson, sat behind the brakeman, Rhymes, on the left-hand side of the engine. This was the side from which the plaintiff approached the crossing. Johnson testified that when he first saw the truck it was approximately 200–300 feet back from the railroad crossing and at that time the locomotive was approximately 150 feet, or three car lengths, from the crossing. He was asked:

"Q. When you first saw the truck did you do anything at that time?

"A. Yes, I talked to the engineer and after I saw it, I talked to him and told him it didn't look like he was going to stop, and the other fellow in front of me said he was not go-to stop and so he big holed it."

He further testified that the train was going about twenty miles per hour.

The brakeman, Rhymes, sat in front of Johnson and on the left side across from the engineer. He gave the following testimony:

"Q. Now, on this particular occasion did you see the truck that Holloway was driving before the collision? Did you see it at any time before?

"A. I see it before he hit, yes, sir.

"Q. Now, when you saw it, did you speak up or holler or call the engineer's attention to it, or just what did you do when you saw it?

"A. When I seen him, then I hollered to the engineer man, 'Here come one,' And I repeated again, 'Here come one.'

"Q. Now, before you did this, before you said, 'Here come one,' the first time, had the conductor, who was sitting behind you, said anything about a car?

"A. He had looked, and he did speak these words, 'All clear on my side,' as he didn't see anything. That is before we had got down to a certain distance, he had looked and he didn't see anything.

"Q. After he said, 'All clear on my side,' did he say anything else before you said, 'Here comes one'?

"A. He said that before I said, 'Here come one.'

"Q. That's what I mean, he said, 'All clear on my side'?

"A. That's right.

"Q. Did he say anything else after that before you said anything?

"A. I don't remember him saying anything.

\* \* \* \* \* \*

"Q. So I am sure I understand you, are you saying that Johnson never said or did anything to indicate that he had seen this truck at anytime before you did?

"A. No, he spoke before I did. He says, 'All clear on my side.'

"Q. All right.

"A. He couldn't see that highway. I wouldn't say that Johnson was looking from the highway, was concerned, but when we got so close I looked between them trees and you could see between them, I see that truck.

"Q. Well, what I am saying, he didn't haul out and say, 'There comes a truck,' before you did?

"A. No, the only thing he said before I did was, 'All clear on my side.'"

Rhymes further testified that at the speed they were going—twenty miles per hour—the train could have been stopped in three car lengths.

The engineer, Wallace, further confirmed that the train as it approached the crossing was doing twenty miles per hour. He testified that when he applies the brakes on the train it is by using a brake valve which is to the left of the engineer and is accomplished by using his left hand. He big holed—emergency stopped—this train approximately fifty to seventy-five feet from the crossing. He never saw the truck prior to the collision. He was asked:

"Q. I assume, when you say big holed it fifty or seventy-five feet from the crossing, you did this because somebody told you to?

"A. Yes, sir.

"Q. Who told you to?

"A. The brakeman.

"Q. That would be Rhymes?

"A. Yes, sir.

"Q. Tell me how he said big hole it?

"A. He come up on his feet and said, 'He is not going to stop.' And I put it in emergency then.

"Q. When he said that, you didn't know if he was talking about a truck, or car, or what?

"A. That's right, I didn't know.

"Q. When he said that, you put it in big hole?

"A. It was an emergency then.

"Q. What about Johnson in the rear? Did he say or do anything to indicate any emergency?

"A. No. No, he didn't say anything."

From this testimony, in my judgment there is no question but that the conductor, Johnson, discovered plaintiff's perilous position in time, under the testimony, when the train could have been stopped. The problem is whether Johnson had means at his control to have stopped the train and avoid the collision.

In Turner v. Texas Co., 138 Tex. 380, 159 S.W.2d 112, 118 (1942), the court said that the actual discovery must be made by the person who inflicted the injury. This might be differently stated as saying that the discovery of the perilous position of the plaintiff must be by a member of the train crew who had some means at his disposal to avoid the collision. The record here is silent as to any brake except the one to the left of the engineer, who applied

it. In my judgment, the evidence is clearly insufficient to show that conductor Johnson's warning was heard and realized by the engineer. To me, the denial of the brakeman that Johnson gave such warning, and in fact his testimony that Johnson gave the all clear signal, together with the fact that the engineer did throw the train into an emergency stop on hearing brakeman Rhymes' warning, confirms my opinion.

If it had been shown there was a brake available for the conductor, Johnson, to use, we would have had a different situation. In Texas & New Orleans Ry. Co. v. Hart, 163 Tex. 450, 356 S.W.2d 901, 907 (1962), it is indicated that locomotives have valves on the fireman's side but we cannot assume this. In that case, Justice Greenhill held that the burden was upon plaintiff to prove there was an emergency brake on the fireman's side.

Appellees argue in their motion for rehearing that the case of Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S. W.2d 561 (1952), at least in the case of a train crew, holds that the discovery by one member of the train crew and proof that some other member of the train crew had means to avoid the collision is sufficient to raise discovered peril. Appellees argue that the train crew is a "team" and that Johnson's discovery of the perilous position of plaintiff in time to avoid the collision made it incumbent on him to get that message to someone capable of stopping the train in time to avoid the accident. However, we have no proof that in a noisy engine cab the conductor from his position in the cab could make himself heard. And, as previously noted, there is absolutely no evidence in this record of any other means at Johnson's command. This may be the holding in the *Ford Case,* but there this problem was not directly involved because there was no question but that the engineer heard the fireman's warning. The court did say:

"When the fireman discovered the perilous position of the plaintiff it was his duty to warn the engineer and to call for the application of the emergency brakes. It then became the duty of the engineer to apply the emergency brakes." Ford v. Panhandle & Santa Fe Ry. Co., supra (252 S.W.2d at p. 563).

Admittedly, this case presents a confusing set of facts which cannot be completely answered by any prior decisions.

It is my judgment that this case should be remanded for new trial and it should be determined whether Johnson had some means at his command to avoid the collision.

The appellee's motion for rehearing is overruled.